Mary RUPPERT, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Angela MAURO, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Alan GREEN, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Cheryl KARNETT, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Jocelyn HILL, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Defendants.

Anthony DeFEO, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Thomas FERGUSON, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Edward and Rose FAICCO, Plaintiffs,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et ano., Defendants.

Margaret MORMORIS, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Olga WHITE, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Lawrence PODELL, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Matthew STONE, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Victoria SHAW, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Steven ZIMMERMAN, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Sue CHAITEN, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Beulah and Bertie HARRIS, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Jeffrey KILMNICK, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Peter LO BRUTTO, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Jacqueline FERGUSON, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Aaron GREEN, Plaintiff,

v.

SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Nos. CV 81–3479, CV 82–2678, CV 83–0998, CV 83–4512, CV 84–0361, CV 84–1253, CV 84–2635, CV 84–3610, CV 85–2660, CV 85–2661 to CV 85–2666, CV 85–3379, CV 86–0603 to CV 86–0605 and CV 86–2084.

United States District Court, E.D. New York.

Oct. 9, 1987.

Robert, Huber & Lerner by Charles Robert, Hempstead, N.Y., for plaintiffs.

Andrew J. Maloney, U.S. Atty. by Peter Ginsberg, Asst. U.S. Atty., Brooklyn, N.Y., for defendant Secretary of the U.S. Dept. of Health and Human Services.

Robert Abrams, New York State Atty. Gen. by Mary Fisher Bernet, Asst. Atty. Gen., New York City, for defendant Com'r. of the N.Y. State Dept. of Social Services.

Martin Bradley Ashare, Suffolk County Atty. by Theodore D. Sklar, First Deputy Co. Atty., Hauppauge, N.Y., for defendant Com'r. of the Suffolk County Dept. of Social Services.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

## I. INTRODUCTION

Beginning in 1981, attorney Charles Robert has filed on behalf of a number of plaintiffs a series of purportedly related actions challenging various decisions and procedures of the Secretary of the United States Department of Health and Human Services ("Secretary") regarding the awarding and calculation of benefits under the Supplemental Security Income program ("SSI"), which Congress enacted as Title XVI of the Social Security Act, 42 U.S.C. §§ 301–1397e, as a means of providing financial assistance to aged, blind, and disabled persons whose income and resources are below certain minimums. 42 U.S.C. §§ 1381–1383c. In a decision dated July 16, 1985 and amended July 17, 1985, then-District Judge Frank X. Altimari, *inter alia*, denied a motion to consolidate the actions pending at that time, dismissed in whole or in part several of the counts contained in the various complaints, and ordered that the cases were to proceed as separate actions and that those cases in which the claims of two or more plaintiffs were joined were to be severed for all purposes.[1] On July 17, 1985 and again on

---

1. The cases covered by Judge Altimari's decision are: *Ruppert v. Schweiker,* No. CV 81–3479; *Goldsmith v. Schweiker,* No. CV 82–1650; *Mau-* *ro v. Schweiker,* No. CV 82–2678; *Alan Green v. Schweiker,* No. CV 83–0998; *Karnett v. Heckler,* No. CV 83–4512; *Hill v. Heckler,* No. CV 84–

December 27, 1985, Magistrate David F. Jordan ordered each of the plaintiffs to file an amended complaint consistent with Judge Altimari's rulings.

Upon Judge Altimari's appointment to the Second Circuit Court of Appeals, these cases, which have informally come to be known as "the *Ruppert* cases", were assigned to this Judge, as have been many of the additional lawsuits Robert has filed on behalf of plaintiffs assertedly aggrieved by the Secretary's actions concerning the SSI program subsequent to Judge Altimari and Magistrate Jordan's orders. This Judge then referred each of the *Ruppert* cases before him to Magistrate Jordan for a report and recommendation as to its appropriate disposition. The Court will now consider the proper resolution of those cases as to which Magistrate Jordan has issued a report and recommendation and the time which the parties had to file any objections to the Magistrate's recommendation has elapsed.

## II. STATUTORY AND REGULATORY FRAMEWORK

The common thread linking the *Ruppert* cases is the question of the plaintiffs' entitlement to SSI or state supplementary assistance benefits. More specifically, although the fact patterns presented by each of the individual actions vary to a greater or lesser extent, a central issue common to the cases is the question of calculation of the "income" or "resources" available to the claimant. Accordingly, before turning to the parties' arguments regarding these cases in general and the specific factual circumstances each individual case involves, the Court will briefly outline the comprehensive statutory and regulatory scheme that controls its decisions in these lawsuits.

Eligibility for SSI benefits is governed by both an individual's living situation and his available income and resources. When it established the SSI program, Congress set up different categories for eligibility based upon, among other things, whether the recipient does or does not have a spouse also eligible for SSI benefits and whether he or she lives alone or in the household of another. 42 U.S.C. §§ 1382, 1382a(a)(2); *see also, e.g.,* 42 U.S.C. § 1382(e). The amount of benefits to which eligible individuals would otherwise be entitled, which depends upon the category into which a given individual falls, is reduced by the amount of any available income not otherwise excludable under the Social Security Act and the regulations the Secretary has promulgated under that statute. 42 U.S.C. §§ 1382(b), 1382a; 20 C.F.R. §§ 416.410–.435.

The Social Security Act characterizes "income" for SSI purposes rather expansively, declaring the term to include both earned and unearned income. While the statute limits "earned income" to wages, net earnings from self-employment, certain refunds of federal income taxes, certain advance payments by employers, and remuneration received for services performed in a sheltered workshop or work activities center, 42 U.S.C. § 1382a(a)(1), it defines "unearned income" as "all other income," including support and maintenance furnished in cash or kind, annuity, pension, retirement, or disability benefits, prizes and awards, a portion of the proceeds of any life insurance policy, gifts, support and alimony payments, and inheritances, and rents, dividends, interest, and royalties, 42 U.S.C. § 1382a(a)(2). The Secretary's regulations describe income as "the receipt by an individual of any property or service which he can apply, either directly or by sale or conversion, to meeting his basic needs," and state, "Income is anything you receive in cash or in kind that you can use to meet your needs for food, clothing, or shelter. In-kind income is not cash, but is actually food, clothing, or shelter, or something you can use to get one of these." The regulations go on to specify what constitutes earned and unearned income, and set forth how "countable income" is calculated. 20 C.F.R. §§ 416.120(c)(2), 416.1102, 416.1110–.1124. The Social Security Act and regulations also exclude various items from income for SSI purposes, such as

0361; and *Thomas Ferguson v. Heckler,* No. CV 84-2635.

certain earned income of students, state public assistance payments, child support payments, and medical care and services. 42 U.S.C. § 1382a(b); 20 C.F.R. §§ 416.-1103, 416.1112, 416.1124.

The regulations also exclude loan proceeds from income countable for SSI purposes. 20 C.F.R. § 416.1103(f). This exclusion is particularly relevant to the litigation at bar since the Secretary's final decision in many of the *Ruppert* cases turned on the question of whether certain arrangements between the claimants and other persons demonstrated the existence of *bona fide* loans. Social Security Ruling ("SSR") 78–26, which is binding on the Secretary and the Social Security Administration ("SSA"),[2] defines a loan as:

> an advance of money from lender to borrower where borrower has to repay, with

or without interest. This applies to any commercial as well as noncommercial loan (between relatives, friends or others) that is recognized as enforceable under State law. The loan agreement may be oral or written, as long as it is enforceable under State law.

. . . .

> Where money is given and accepted on any understanding between parties, other than it is to be repaid by the receiver of the money, there is no loan involved for SSI purposes. Such money could be a gift, support payments, etc., and must be treated accordingly (i.e., as provided in rules applicable to such items).

The Ruling places on claimants the burden of proving the *bona fide* nature of an asserted loan agreement.[3]

---

**2.** 20 C.F.R. § 422.408 states:
Precedent final opinions and orders and statements of policy and interpretations that have been adopted by the [Social Security] Administration and that are not published in the FEDERAL REGISTER will be made available by publication in the Social Security Rulings.... Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.
The SSA, as the name implies, is the federal agency responsible for administering the various programs Congress established under the Social Security Act.

**3.** In June 1985, subsequent to his final determinations regarding most of the plaintiffs in these cases, the Secretary elaborated as follows upon the meaning of a loan for SSI purposes in a manual designed to aid SSA employees in the interpretation and application of the Social Security Act and its accompanying regulations:
A loan is a transaction whereby one party (lender) advances money to another party (borrower)(or on behalf of another party) who promises to repay the debt in full within his lifetime, with or without interest.

. . . . .

In many cases, loans which are negotiated between individuals are informal. Such loans may be made on the basis of an oral or a formal written agreement. This is especially true where loans are transacted between relatives or friends. For title XVI purposes a bona fide loan may be established regardless of whether or not a written instrument exists. Thus, the transaction or agreement which creates the loan may be either written or oral. Where there is a written agreement between the borrower and a lender who is not normal-

ly engaged in the business of making loans, apply the criteria in a., b., and c. below to determine whether the proceeds are a loan or must be counted as income. Any loan agreement (whether oral or written) must include the following components and must be legally binding under State law in order to be a bona fide loan for SSI purposes:
a. borrower's acknowledgement of obligation to repay (with or without interest); and
b. timetable and plan for repayment (e.g., borrower plans to repay the loan when he receives future anticipated income (see c. below)); and
c. the borrower's express intent to repay either by pledging real or personal property or anticipated income.
It is not necessary that the loan be secured solely by specific items of collateral such as real or personal property. It is only necessary that the borrower express his intent to repay the loan when funds become available in the future and indicates that he will be repaying a loan when he receives future anticipated income (e.g., title II benefits, title XVI payments, or income from any other source).

. . . . .

Programs Operations Manual System ("POMS") Manual 01110.030(E) (June 1985). A POMS manual does not have the force of law, but courts should give due weight to statutory and regulatory interpretations contained in such an explicative guide. *See St. Mary's Hospital of Troy v. Blue Cross and Blue Shield Association,* 788 F.2d 888, 890 (2d Cir.1986); *Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 325 n. 16 (5th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). It may also be worthy of note that POMS Manual 01110.030(E) tracks to

"Resources," although not explicitly defined in the Social Security Act, is defined by the Secretary's regulations to mean "cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his support and maintenance." 20 C.F.R. §§ 416.120(c)(3), 416.1201(a). The statute and regulations exclude from treatment as resources items such as an individual's home, household goods, personal effects, and car, and life insurance to a certain extent. 42 U.S.C. § 1382b; 20 C.F.R. §§ 416.1210–.1237. An individual who lives with a spouse is eligible for SSI only if he possesses no more than $2,250.00 worth of includable resources, while persons who do not have such living arrangements are limited to resources of $1,150.00. 42 U.S.C. §§ 1382(a)(1)(B), (a)(2)(B); 20 C.F.R. § 416.1205; see also 20 C.F.R. §§ 416.1240–.1244. Additionally, any transaction within two years preceding an application for SSI benefits in which a resource is given away or sold at less than fair market value shall be presumed to have been for the purpose of establishing eligibility for SSI and the resource will be included for purposes of determining SSI eligibility unless it can be established by clear and convincing evidence that the transaction was exclusively for some other purpose besides an attempt to obtain benefits. 42 U.S.C. § 1382b(c); 20 C.F.R. § 416.1246.

If an individual is living in the household of another and is receiving in-kind support and maintenance from that person, the recipient's SSI benefits may be automatically reduced by one third rather than by the actual or presumed value of such support and maintenance. 42 U.S.C. § 1382a(a)(2)(A). This "one third reduction rule" applies only if the person in whose household the recipient is living provides both food and shelter. 20 C.F.R. §§ 416.1130(c), 416.1131. The "presumed value rule" covers those individuals receiving countable in-kind support and maintenance

but not falling within the scope of the one third reduction rule. Under the presumed value rule, the SSA presumes that any food, clothing, or shelter provided an SSI recipient is worth a maximum value of one third of the recipient's benefits plus the $240.00 general income exclusion that § 1612(b) of the Social Security Act, 42 U.S.C. § 1382a(b), excludes from the countable income of all SSI applicants. This rule allows an SSI recipient with no other income to receive the same amount of benefits as an individual to whom the one third reduction rule applies. If an individual can show that the presumed value is greater than the actual value of the food, clothing, and shelter received, the actual value will be used as a basis for calculating the individual's unearned income; if the individual does not question the use of the presumed value or if the presumed value is less than the actual value, the presumed value will be the basis. 20 C.F.R. §§ 416.1130(c), 416.1140–.1141.

The Secretary's regulations define "in-kind support and maintenance" as "any food, clothing, or shelter that is given to [an individual] or that [an individual] receive[s] because someone else pays for it. Shelter includes room, rent, mortgage payments, real property taxes, heating fuel, gas, electricity, water, sewerage, and garbage collection services." A person who pays for his shelter under a business arrangement is not considered to be receiving in-kind support and maintenance in the form of shelter. 20 C.F.R. § 416.1130(b).

A "household" is defined as "a personal place of residence." An SSI recipient is considered to be living in his own household if he or his spouse has an ownership or life estate interest in the home or is liable to the landlord for payment of any part of the rental charges, he pays at least a *pro rata* share of household and operating expenses, he lives in a noninstitutional care situation as defined in the regulations,[4] or all members of the household

a great degree the language and approach of a Regional SSA Program Circular dated June 4, 1979 and numbered SSI–79–13 ("Regional Circular SSI–79–13") that was distributed to SSA employees in the New York Region.

**4.** 20 C.F.R. § 416.1143(a) defines a noninstitutional care situation as a situation in which a

receive public income maintenance payments. An individual is considered to be living in another person's household, on the other hand, when none of these situations is present, a person in the household where the recipient resides provides the recipient with support and maintenance, and that person is not the recipient's spouse, a minor child, or a parent or other person whose income can be deemed to be that of the recipient. 20 C.F.R. § 416.1132.

Congress structured the Social Security Act so as to encourage states to provide supplementary assistance to recipients of federal SSI benefits. For instance, the act provides that the Secretary will administer the supplementary assistance program of any state that enters into an appropriate agreement with the Secretary. 42 U.S.C. § 1382e; *see also* 20 C.F.R. §§ 416.-2001–.2098. New York State has authorized its Department of Social Services to enter into such an agreement, N.Y.Soc. Serv.L. § 211, and the New York Department of Social Services and the Secretary have in fact done so. The agreement, relevant parts of which have been codified as part of the New York Social Services Law, establishes several benefit levels based upon different living arrangements, including one payment level for persons "living alone" and a lower payment level for individuals "living with others." "Living alone" is defined as "living in a private household composed of one eligible individual or one eligible couple," while "living with others" is declared to mean:

> living in a private household composed of an eligible individual or couple and at least one other person, or, with respect to any child who is not the head of a household and who is under the age of eighteen, or under the age of twenty-two if attending school, any living arrangement.

N.Y.Soc.Serv.L. §§ 209(2)(a), (2)(b), (3)(a), (3)(b).

It sometimes happens that an SSI recipient is paid benefits in excess of the amount to which he is entitled. The Social Security Act and the regulations promulgated under it provide that whenever the Secretary finds that an incorrect amount of benefits has been paid, he shall make the necessary adjustment or recovery through appropriate adjustments to future payments or recovery from or payment to the incorrectly paid individual. The Secretary, however, is not entitled to downward adjustment or recovery of benefits where the recipient is "without fault" and such adjustment or recovery would either "defeat the purpose" of the SSI program, "be against equity or good conscience," or "impede efficient or effective administration" of the program due to the small amount involved. 42 U.S.C. § 1383(b); 20 C.F.R. § 416.550. Although the determination of whether an individual is without fault depends on the circumstances of a particular case, a person will be deemed to be at fault if an overpayment results from, among other things, "(a) [f]ailure to furnish information which the individual knew or should have known was material; (b) [a]n incorrect statement made by the individual which he knew or should have known was incorrect...., or (c) [t]he individual did not return a payment which he knew or could have been expected to know was incorrect." 20 C.F.R. § 416.552. Adjustment or recovery is considered to defeat the SSI program's purpose where an individual's income and resources are needed for ordinary and necessary living expenses. 20 C.F.R. § 416.553. Adjustment or recovery is viewed as inequitable and contrary to good conscience when a person, in reliance on the SSI payments he received or on notice that such payments would be made, relinquished a valuable right or changed his position for the worse. 20 C.F.R. § 416.554. Administration of the SSI program is deemed impeded because of the small amount involved upon consideration of the average administrative cost of handling a particular overpayment case

---

public or private agency places an individual under a specific program such as foster or family care in a private household licensed or approved by the agency to provide care, the plac-

ing agency is responsible for the individual's care, and the individual, agency, or someone else pays for the provided care.

through the adjustment or recovery procedures. 20 C.F.R. § 416.555.

The Secretary's final decisions regarding claimants' entitlement to SSI benefits are subject to judicial review by the federal district courts. A court must give conclusive weight to the Secretary's findings of fact concerning a claimant's entitlement to benefits if the findings are supported by substantial evidence on the record as a whole. 42 U.S.C. §§ 405(g), 1383(c)(3); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978). As interpreted by the Supreme Court, "substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). A reviewing court is thus compelled to accept the Secretary's supported findings of fact. A court, however, is not bound by the Secretary's conclusions or interpretations of law, or an application of an incorrect legal standard. *E.g., Kuebler v. Secretary of the United States Dep't of Health and Human Services*, 579 F.Supp. 1436, 1438 (E.D.N.Y. 1984); *Sokoloff v. Richardson*, 383 F.Supp. 234, 236 (E.D.N.Y.1973); *Ridgely v. Secretary of the Dep't of Health, Education and Welfare*, 345 F.Supp. 983, 988 (D.Md. 1972), *affirmed*, 475 F.2d 1222 (4th Cir. 1973). As one court noted, "Before the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Klofta v. Matthews*, 418 F.Supp. 1139, 1141 (E.D.Wis.1976).

Therefore, in considering the issues presented by the *Ruppert* cases, the Court is bound by a quite detailed and explicit set of statutory and regulatory provisions that establishes not only the criteria under which individuals' entitlement to SSI or state supplementary assistance benefits is to be evaluated but also the essentially deferential standard that courts are to follow in considering challenges to the Secretary's determinations.

## III. GENERALIZED CHALLENGES TO SECRETARY'S ACTIONS

As the Court observed above, *supra* p. 157, although the specific factual circumstances each of the *Ruppert* cases presents vary to a greater or lesser degree, the claims of the individual plaintiffs all pertain to the issue of their entitlement to SSI or state supplementary assistance benefits. The papers filed on behalf of many of the individual plaintiffs, therefore, contain not only arguments relevant to the question of whether the Secretary's determination as to a given plaintiff's entitlement to benefits is supported by substantial evidence, but also assertions concerning the general validity of the Secretary's decisions regarding and procedures governing the awarding and calculation of benefits. The Court will now address some of plaintiffs' broader challenges to the Secretary's administration of the SSI and New York supplementary assistance programs.[5]

---

**5.** In the concluding section of his rather thorough opinion in *Glasgold v. Secretary of Health and Human Services*, 558 F.Supp. 129 (E.D.N.Y. 1982), *affirmed sub. nom., Rothman v. Schweiker*, 706 F.2d 407 (2d Cir.) (per curiam), *cert. denied sub. nom., Guigno v. Heckler*, 464 U.S. 984, 104 S.Ct. 428, 78 L.Ed.2d 362 (1983), which also involved challenges to the administration of the SSI program brought by Charles Robert (along with the Nassau County Law Services Committee and Robert's former law firm) on behalf of various SSI claimants, *see infra* pp. 163–64, 165, and 170, then-District Judge Pratt was moved to write:

During the pendency of these actions, numerous memoranda, letters, excerpts from cases, magazine and newspaper articles, and other relevant materials have been supplied to the court by the parties. It has been a burdensome task for the court to sort out and attempt to deal with the major arguments presented; undoubtedly, some issues have not been addressed as thoroughly as they might have been had they been presented more concisely and with more clarity. However, the court has carefully and conscientiously plowed through all of the materials available and tried to consider all of the points made by the parties.

558 F.Supp. at 151–52. Judge Pratt's comments are equally applicable to this litigation. As Judge Altimari stated in his July 16, 1985 deci-

## A. "Clandestine Policies" and "Ad Hoc" Decisionmaking

The briefs filed on behalf of a number of the plaintiffs put forth the contention that, as part of a "clandestine policy" designed to deny applicants SSI benefits to which they are rightfully entitled, the Secretary, Administrative Law Judges ("ALJs"), and other SSA personnel are intentionally misapplying terms such as "household" and "loan" whose definitions are clearly set forth in the Secretary's own regulations, failing to instruct SSI claimants as to the meaning of these terms so as to "trap" them into providing information that can be used as grounds for refusing to award the desired benefits, and using standards that have never been promulgated pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–59, 701–06, and that are based merely upon "ad hoc" rationale.[6]

■ It is true that in recent years the SSA's administration of the various programs the Social Security Act established has not always been in conformance with the language and spirit of the statute and judicial decisions setting forth the standards that must govern determinations as to claimants' entitlement to benefits under the act. Only recently, for instance, the Second Circuit has berated the Secretary for his apparent "Janus-faced" avowal of adherence in Social Security disability cases to the fifteen year old "treating physician rule" while consistently acting in violation of the rule. *Hidalgo v. Bowen,* 822 F.2d 294 (2d Cir.1987).[7] *See also Stieberger v. Bowen,* 801 F.2d 29 (2d Cir.1986); *Schisler v. Heckler,* 787 F.2d 76 (2d Cir.1986); *City of New York v. Heckler,* 578 F.Supp. 1109 (E.D.N.Y.), *affirmed,* 742 F.2d 729 (2d Cir. 1984), *affirmed,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). Note, *Government Nonacquiescence Case in Point: Social Security Litigation,* 2 Touro Law Review 197 (1986). Even if the Court were to accept plaintiffs' claim of a clandestine policy, however, the circumstances of the *Ruppert* cases would still not be such as to justify any broad-based ruling by the Court grounded upon the Secretary and SSA employees' purportedly wrongful policy since the Court's review of each of the cases now before it reveals no misapplications of regulations or other improprieties that cannot be rectified by consideration of the facts surrounding each individual case in light of the law and regulations and substantial evidence test that govern judicial review of SSI applicants' claims.[8]

sion, "To characterize the papers submitted in connection with [the *Ruppert* cases] as unnecessarily voluminous would surely be a gross understatement." *Ruppert,* No. CV 81–3479, slip op. at 5 (E.D.N.Y. July 16, 1985). The flood of memoranda, exhibits, and letters filed, particularly by plaintiffs, has continued unabated in the more than two years since Judge Altimari's decision, and brings to mind the seventeenth century French mathematician and philosopher Blaise Pascal's pithy remark, "I have made this letter longer than usual only because I had not the time to make it shorter." B. Pascal, *Provincial Letters* XVI (1656). The parties, however, have had more than ample time to stem the torrent of seemingly endless filings. Decreased verbiage, softened rhetoric, and more conscientious editing, it should not be forgotten, often better serve to highlight the heart of litigants' positions.

6. *See, e.g.,* papers filed in *Ruppert,* No. CV 81–3479; *Karnett,* No. CV 83–4512; *White v. Secretary,* No. CV 85–2661; *Podell v. Secretary,* No. CV 85–2662; *Stone v. Secretary,* No. CV 85–2663; and *Aaron Green v. Secretary,* No. CV 86–2084.

7. The treating physician rule states that the expert medical opinion of a claimant's treating physician regarding his patient's condition is binding on the Secretary unless controverted by substantial evidence. *E.g., Schisler v. Heckler,* 787 F.2d 76, 81 (2d Cir.1986); *Bluvband v. Heckler,* 730 F.2d 886 (2d Cir.1984). A contrary medical opinion by a doctor who has not actually examined the claimant cannot by itself constitute the requisite substantial evidence. *E.g., Echevarria v. Secretary of Health and Human Services,* 685 F.2d 751 (2d Cir.1982).

8. Although the Court does not need to reach the merits of plaintiffs' arguments concerning the existence of a "clandestine policy," the Court does wish to remark that plaintiffs point to little concrete evidence tending to support their claim, relying instead primarily upon blanket assertions that the Secretary and the SSA are intentionally trying to "misinform," "confuse," and "trap" SSI applicants. The Court additionally wishes to make the observation that the fact that the Secretary chose to specify in an August 1985 POMS Manual that the term "household" as used for purposes of the SSI program is not likely to be precisely equivalent to common usage of the term and that SSA personnel

## B. *Effect of Fanning v. Heckler*

Many of plaintiffs' briefs set forth the argument that Judge Altimari's opinion in the case of *Fanning v. Heckler*, No. CV 84–2614, slip op. (E.D.N.Y. December 4, 1985), undermines the Secretary's determinations in various of the *Ruppert* cases and controls the Court's consideration of various of the actions now at bar. Plaintiffs further contend that the Secretary has "intentionally ignored" the holding in *Fanning* and failed to honor the principle of *stare decisis.* [9]

*Fanning* involved an appeal from a final decision of the Secretary that Mary Fanning, a twenty five year old woman with a history of mental illness, did not have any rental liability or a loan agreement with her parents for the support they furnished and was living in her parents' household rather than alone for purposes of calculating SSI benefits. Upon review of the Secretary's determination, Judge Altimari found that under the specific circumstances of the case, including the fact that Fanning had turned over her retroactive SSI checks to her father and repaid all the outstanding asserted indebtedness owed to her parents, Fanning did indeed have rental liability and should have been considered to be living in her own household for SSI purposes, and that the Secretary's decision to the contrary was not supported by substantial evidence.

Judge Altimari's ruling in *Fanning* may serve to illustrate the fallacy of the Secretary's decision in a given situation or perhaps even an act of frugality on the part of the SSA that flies in the face of the Social Security Act and the Secretary's own regulations. Nonetheless, *Fanning* is by its own terms merely a judicial remedying of incorrect administrative handling of a single SSI claimant's application for benefits. The case in no way undermines the positions the Secretary has taken in the controversies now before the Court, and his determinations in the current actions do not demonstrate any failure to comply with Judge Altimari's decision. *Fanning* does not at all control the Court's analysis of other appeals from the Secretary's final determinations regarding the eligibility of SSI applicants for the benefits they seek, and has no binding precedential weight in subsequent SSI cases such as those the Court is now considering. *Fanning*, in other words, although a logical, supportable, and, in the opinion of this Judge, essentially correct resolution of a particular dispute between the Secretary and an SSI applicant, simply fails to resonate with the broader significance and implications which the *Ruppert* plaintiffs wish the Court now to read into the case.

## C. *Secretary's Administration of New York State Supplementary Assistance Program*

Certain of the individual *Ruppert* plaintiffs challenge in their papers the validity

should explain the definition of a household under the regulations to SSI claimants in understandable language does not necessarily prove, as plaintiffs appear to maintain, that the SSA was obviously acting in clear violation of the Social Security Act and regulations prior to the issuance of that manual. *See* POMS Manual 00835.120(C)(3) (August 1985).

Furthermore, plaintiffs' contention that the Secretary's clandestine policy consists in part of an illegal reliance upon interpretations of the Social Security Act and rules contained in POMS manuals that have not been promulgated in accordance with the requirements of the APA reflects a misreading of the APA. APA § 553(b) states that, "Except when notice or hearing is required by statute," the rulemaking provision of the APA does not apply "(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). Since the Social Security Act

does not contain any notice or hearing requirements, the APA's specifications regarding notice and opportunity for comment do not govern the Secretary's use of interpretative and procedural guides such as the POMS manuals. Also, it should be noted that the only reason that the APA applies to the SSI program at all is because the Secretary has elected to abide by the APA's conditions regarding rulemaking. *See* Statement of Policy, 36 Fed.Reg. 2532 (1971). § 553(a) of the APA exempts from APA coverage matters "relating to agency management or personnel or to the public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a).

9. *See, e.g.,* papers filed in *Ruppert,* No. CV 81–3479; *Mauro,* No. CV 82–2678; *Karnett,* No. CV 83–4512; *Mormoris v. Secretary,* No. CV 85–2660; *White,* No. CV 85–2661; *Podell,* No. CV 85–2662; *Stone,* No. CV 85–2663; and *Aaron Green,* No. CV 86–2084.

of New York State's method of categorizing the living arrangements of SSI recipients as set forth in N.Y.Soc.Serv.Law § 209 and the Secretary's application of these classifications in his calculations of state supplementary assistance levels pursuant to his administrative responsibilities under the agreement into which New York and the Secretary entered.[10] Essentially, these plaintiffs contend that the categories New York and the Secretary employ are inconsistent with the Secretary's regulations and with this Court's decisions in *Glasgold v. Secretary of Health and Human Services*, 558 F.Supp. 129 (E.D.N.Y. 1982), *affirmed sub. nom.*, *Rothman v. Schweiker*, 706 F.2d 407 (2d Cir.) (per curiam), *cert. denied, sub. nom.*, *Guigno v. Heckler*, 464 U.S. 984, 104 S.Ct. 428, 78 L.Ed.2d 362 (1983),[11] and *Ahrens v. Bowen*, 646 F.Supp. 1041 (E.D.N.Y.1986).

First, plaintiffs assert that the effect of the distinction made between "living alone" and "living with others" is that 20 C.F.R. § 416.2001(a) is violated. § 416.2001(a), to the extent that it is relevant to plaintiffs' position, defines state supplementary payments as payments made "[i]n supplementation of the Federal supplemental security income benefits, *i.e.*, as a complement to the Federal benefit amount, thereby increasing the amount of income available to the recipient to meet his needs." 20 C.F.R. § 416.2001(a)(1). Plaintiffs claim that the categorization at issue decreases the benefits of certain SSI recipients and thereby contravenes § 416.2001(a). Plaintiffs' argument misses the mark. The distinctions in benefit levels based on living arrangements do not decrease anyone's SSI benefits or amount of available income. They simply provide that certain individuals will, because of New York and the Secretary's evaluation of their relative need for income supplementation, receive less additional public support in the form of state supplementary assistance payments than others.

■ Second, plaintiffs contend the New York state supplementary assistance pro-

gram and its administration by the Secretary is at odds with 20 C.F.R. § 416.2030, which provides, in pertinent part:

(a) *Payment level.* The level of State supplementary payments may vary for each category the State elects to include in its federally administered supplement. These categorical variations of payment levels must be specified in the agreement between the Secretary and the State. . . .

. . . .

(2) *Living arrangements.* In addition, a State may elect no more than five variations in recognition of the different needs which result from various living arrangements. Types of living arrangements for which variations may be allowed include arrangements such as:

(i) Living alone,

(ii) Living with an ineligible spouse,

(iii) Personal care facility,

(iv) Domiciliary or congregate care facility.

(b) *Relationship to actual cost differences.* Under the agreement, variations in State supplementary payment levels will be permitted for each living arrangement the State elects. These differences must be based on rational distinctions between both the types of living arrangements and the cost of these arrangements.

Plaintiffs argue that the living arrangement variations utilized in New York impermissibly establish six rather than the maximum five categories. However, plaintiffs' contention notwithstanding, examination of New York and the Secretary's agreement makes apparent that the purported "sixth" category, "living in the household of others" is merely a subset of the category "living with others" much in the way living arrangements such as "family type home," "foster care for adults," "half-way house," and "community residence" are sub-classifications of the two different classifications of "congregate care." Moreover, the Second Circuit has

---

**10.** *See, e.g.*, papers filed in *Lo Brutto v. Secretary*, No. CV 86–0604; and *Aaron Green*, No. CV 86–2084.

**11.** *See supra* note 5 and *infra* p. 170.

already determined in *Termini v. Califano*, 611 F.2d 367 (2d Cir.1979), that the distinction between "living alone" and "living with others" used in New York has a rational basis in the "commonsense proposition that individuals living with others usually have reduced per capita costs because many of their expenses are shared," *id.* at 370, and therefore is in conformance both with § 416.2030(b) and the United States Constitution.

Third, plaintiffs cite to the Court *Glasgold's* holding that the agreement between New York and the Secretary and federal and state statutory schemes, when read together, require that federal rules for calculating income must be applied to computations not only of federal SSI benefits but also of state supplementary assistance payments. Plaintiffs read *Glasgold* as providing support for the preposition that the category "living with others" used in determinations of the level of supplementary assistance to be paid individuals must be narrowed in scope so as to parallel the federal definition of "living in the household of another" used in federal SSI determinations. *Glasgold*, however, concerned the proper mode for determining countable income, not individuals' living arrangements. 20 C.F.R. § 416.2030 makes explicit that states can establish varying levels of payments based upon their own rational assessment of different needs that may result from divergent forms of living arrangements and may, within certain guidelines, decide for themselves the classifications of living arrangements to be employed. *Glasgold*, moreover, itself discussed in a lengthy footnote the Second Circuit's ruling in *Termini* without even a hint of criticism. 558 F.Supp. at 139 n. 7.

Finally, plaintiffs maintain that Judge Mishler's decision in *Ahrens* somehow supports their position. *Ahrens* involved the issue of whether punitive damage awards should properly be included as income countable for SSI purposes. Judge Mishler found that the broad definition of income set forth in the Social Security Act and its accompanying regulations requires that punitive damages be considered countable income even though New York state law would provide otherwise. *Ahrens*, therefore, does not at all concern itself with categories of living arrangements and, like *Glasgold*, merely addresses certain questions as to the proper treatment for SSI-related purposes of a specific form of income.

### D. *Role of State Law in Determining Existence of Valid "Loan"*

As the Court noted earlier in this opinion, *supra* p. 10, the Secretary's decision in many of the individual *Ruppert* cases hinged upon his conclusion concerning whether the arrangements between the SSI claimants and other persons regarding finances and support were such as to demonstrate the existence of "loans" valid for SSI purposes. A number of the briefs filed by both plaintiffs and the Secretary, therefore, address the issue of whether an individual plaintiff's arrangements with relatives constitute, in the phrase used throughout many of plaintiffs' papers, "a valid debtor/creditor relationship".[12] The determination of whether a particular arrangement between an SSI claimant and another evidences a *bona fide* loan for SSI purposes necessarily depends on the specific facts presented, and the parties devote a good deal of space in the briefs to whether given facts do or do not warrant the conclusion that a SSI recipient has entered into a valid loan agreement. The parties also appear, however, to be in more general disagreement as the proper interpretation of the regulations and rulings that govern the question of whether certain monies or other goods should be excluded from countable income as proceeds of a loan. One such disputed area concerns the effect of state law on the SSA's decisions.

SSR 78–26, which the Court has previously set forth in relevant part, *supra* p. 158, defines a loan for SSI purposes as "an advance of money from lender to borrower where borrower has to repay, with or without interest," and states that this definition applies equally to lender/borrow-

---

12. *See, e.g.,* papers filed in *Ruppert,* No. CV 81–3479; *Mauro,* No. CV 82–2678; *Karnett,* No.

CV 83–4512; *Mormoris,* No. CV 85–2660; *White,* No. CV 85–2661; and *Podell,* No. CV 85–2662.

er agreements whether they be commercial or noncommercial, oral or written, so long as the arrangement at issue is enforceable under the applicable state law.[13] Under New York law,[14] an agreement is only legally binding if there is both mutuality of agreement and mutuality of obligation, *i.e.*, the parties involved in the transaction must each have agreed to the terms of the arrangement and taken upon themselves certain obligations they are bound to perform. *See e.g., Dorman v. Cohen,* 66 A.D.2d 411, 413 N.Y.S.2d 377 (1st Dep't 1979); *Brooklyn Union Gas Co. v. Jimeniz,* 82 Misc.2d 948, 371 N.Y.S.2d 289 (N.Y.C.Civ.Ct.1975). Furthermore, where a supposedly constraining promise by a party to an agreement is unduly vague, indefinite, or unspecific, or where the person making the promise is free to perform or not as he so chooses, the agreement is illusory and will not be enforced. *E.g., Mocca Lounge, Inc. v. Misak,* 94 A.D.2d 761, 462 N.Y.S.2d 704 (2d Dep't 1983); *Silvera v. Safra,* 79 Misc.2d 919, 361 N.Y.S.2d 250 (Sup.Ct.N.Y. Co.1974); *Ivor B. Clark, Inc. v. Boston Road Shopping Center, Inc.,* 207 N.Y.S.2d 582 (Sup.Ct.N.Y.Co.1960). An oral loan agreement is no less enforceable than one that is written, so long as it does not run afoul of the New York statute of frauds, N.Y.Gen.Oblig.L. § 5–701(a).[15] *See, e.g., Right Turn Ltd. v. Sloan,* 88 A.D.2d 889, 452 N.Y.S.2d 605 (1st Dep't 1982); *Banker's Trust Co. of Western New York v. Steenburn,* 95 Misc.2d 967, 409 N.Y.S.2d 51 (Sup.Ct. Chautauqua Co.1978), *affirmed,* 70 A.D.2d 786, 418 N.Y.S.2d 723 (4th Dep't 1979).

Plaintiffs apparently accept the basic legitimacy of SSR 78–26's incorporating state law to some extent into the SSA's consideration of purported loan agreements and have not controverted the assertions the Secretary has made in his papers regarding some of the basic elements a loan need possess to be enforceable under New York law. Rather, plaintiffs rely upon New York law to call into question the Ruling's placement of the burden of proving the *bona fide* nature of an asserted

**13.** *See also* POMS Manual 01110.030(E) and Regional Circular SSI–79–13, which are discussed *supra* note 3.

**14.** Each of the individual plaintiffs and the persons with whom they assertedly entered into loan agreements appear to be New York residents.

**15.** § 5–701 reads:

*Agreements required to be in writing*

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;

2. Is a special promise to answer for the debt, default or miscarriage of another person;

3. Is made in consideration of marriage, except mutual promises to marry;

[4. Repealed]

5. Is a subsequent or new promise to pay a debt discharged in bankruptcy;

6. Notwithstanding section 2–201 of the uniform commercial code, if the goods be sold at public auction, and the auctioneer at the time of the sale, enters in a sale book, a memorandum specifying the nature and price of the property sold, the terms of the sale, the name of the purchaser, and the name of the person on whose account the sale was made, such memorandum is equivalent in effect to a note of the contract or sale, subscribed by the party to be charged therewith;

[7, 8. Repealed]

9. Is a contract to assign or an assignment, with or without consideration to the promisor, of a life or health or accident insurance policy, or a promise, with or without consideration to the promisor, to name a beneficiary of any such policy. This provision shall not apply to a policy of industrial life or health or accident insurance.

10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.

loan agreement on the SSI recipient. Plaintiffs contend that where an issue arises as to whether a transfer of cash or goods was a loan or a gift, New York law places the burden of proof upon the party seeking to claim a gift, and cite in support of their position the Southern District of New York's statement in *Rabinof v. United States*, 329 F.Supp. 830, 839 (S.D.N.Y. 1971) that:

> The law [of New York] never presumes a gift. *Matter of Bolin*, 136 N.Y. 177, 180, 32 N.E. 626 (1892). On a doubtful record the ruling must be against a gift. *In re Grauds' Estate*, 43 N.Y.S.2d 803 (Sur.Ct., N.Y.1943).

> . . . .

> It is obvious that the burden of proof is upon [the parties claiming a gift] and that they must prove each and every element essential to establish the gift. *Matter of Housman*, 224 N.Y. 525, 121 N.E. 357 (1918); *Matter of Kelly*, 285 N.Y. 139, 150, 33 N.E.2d 62 (1941).

■ New York law regarding burdens of proof, however, is not germane to determinations by the Secretary and SSA employees as to whether a given transaction evinces a loan for purposes of administration of the SSI program. Federal regulations and rules, not state law, define the conditions under which a transaction will be deemed a loan for SSI purposes. State law comes into play only to the extent that a federal provision explicitly declares its applicability to a given situation. The language of SSR 78–26 makes clear that state law is relevant to SSA consideration of claimed loans only insofar as *enforceability* of a supposed lender/borrower transaction is concerned; state law has no role in the determination of whether particular circumstances demonstrate the existence of a loan in the first place and the procedures for how this determination is to be made.[16]

### E. *In–Kind Support and Maintenance as Loans*

The Secretary has taken the position in SSI cases that the definition of a "loan" set forth in 20 C.F.R. § 416.1103(f) and SSR 78–26 does not cover situations involving the borrowing of in-kind support and maintenance such as food, clothing, and shelter but only those in which cash is lent. Various of the *Ruppert* plaintiffs maintain in their papers that the Secretary's stance reflects an unduly restrictive and improper interpretation of the relevant regulation and ruling and of the Social Security Act itself, and urge the Court to adopt the Fifth Circuit's holding in *Hickman v. Bowen*, 803 F.2d 1377 (5th Cir.1986), that loans for SSI purposes encompass more than just cash loans. The Secretary contends in response to plaintiffs' assertions that *Hickman* was wrongly decided, and argues that the requirement that loans be made in cash rather than other goods is logically based

---

16. The complete references to state law contained in SSR 78–26 are as follows:

> . . . . The interpretation of a bona fide loan for SSI purposes is that where a borrower receives money (from relatives, friends or others) a loan is created if there is an understanding between the parties that the money borrowed is to be repaid and it is recognized as an enforceable contract under State law. The transaction which creates a loan can be in the form of a written or oral agreement if enforceable under State law. . . .

> . . . . . . . .

> [The definition of a loan set forth] applies to any commercial as well as noncommercial loan (between relatives, friends or others) that is recognized as enforceable under State law. The loan agreement may be oral or written, as long as it is enforceable under State law.

> . . . . . . . .

> If there is a bona fide loan as defined [in the Ruling], a rebuttable presumption is created that the loan meets the definition of a resource and it is a countable resource to the lender unless the presumption can be rebutted.

> For example, an SSI claimant (lender) reports an outstanding loan (based on an oral agreement) made to a relative (borrower). In this particular State such agreements are enforceable. Accordingly, the loan is presumed to be a resource to the lender because it can be converted to cash if the lender calls for repayment from the borrower. . . .

> The sole reference to state law in POMS Manual 01110.030(E) is the statement that, "Any loan agreement (whether oral or written) must . . . . be legally binding under State law in order to be a bona fide loan for SSI purposes." Regional Circular SSI–79–13 contains an identical sentence. *See supra* note 3.

upon the idea that it is easier to follow and verify transactions in which cash changes hands and thereby reduces the potential for abuse.[17]

In *Hickman,* the Fifth Circuit faced the question of whether the provision of in-kind support and maintenance could, under the proper set of factual circumstances, constitute a loan excludable from an SSI claimant's countable income. After noting that the issue was one of first impression and that the Social Security Act's legislative history did not shed any light on the subject, the *Hickman* court focused on the language of the statute and determined that Congress did not intend for a distinction to be drawn between the treatment of cash and in-kind income. The statute, the court observed, defines "income" to include both earned and unearned income, 42 U.S.C. § 1382a(a), and specifically declares unearned income to include support and maintenance whether furnished in cash or in kind. 42 U.S.C. § 1382a(a)(2)(A). The Secretary's regulations, in the view of the Fifth Circuit, similarly fail to support what the court termed the "fine distinction" between cash and other goods. 803 F.2d at 1381–82.

The *Hickman* court then turned its attention to the specific language of 20 C.F.R. § 416.1103(f), which reads in relevant part:

> *Proceeds of a loan.* Money you borrow or money you receive as repayment of a loan is not income. . . . Buying on credit is treated as though you were borrowing money and what you purchase this way is not income.

The first sentence of the regulation, the court found, does not purport to exclude non-cash loans: Although most loans are money loans, the regulation neither states nor implies that other forms of lender/borrower transactions do not qualify for treatment as loans. Moreover, by addressing credit transactions, the regulation "sweeps beyond simply cash loans. Certainly, if someone purchases food or shelter on credit, and it is excluded from income, borrowing or being advanced such necessities should be treated similarly. In either case, as with a loan, the borrower is liable and must repay the lender." 803 F.2d at 1382.[18]

In sum, the Fifth Circuit concluded, there is no legitimate difference under the Social Security Act and regulations between a situation in which an SSI recipient receives a cash loan from a friend or relative that enables her to pay for household expenses and a situation where the recipient is directly given the household benefits and agrees to pay the provider for their cash value at some point in the future. *Id.*

This Court finds *Hickman's* logic and conclusion to be convincing. Neither the Social Security Act nor the Secretary's own regulations provide justification for the Secretary's position that only cash transactions may qualify as loans for SSI purposes. Moreover, the Secretary's restrictive reading of that which qualifies as a loan has an even harsher effect on the poor who comprise SSI recipients than such a narrow construction would have if applied to a program designed to aid those possessing greater economic resources: Poor SSI claimants do not live in a socioeconomic vacuum, but rather generally reside in an environment consisting primarily of other poor people; relatives and friends who might be willing to supply loans to SSI

---

17. *See e.g.,* papers filed in *Ruppert,* No. CV 81–3479; *Mauro,* No. CV 82–2678; *Karnett,* No. CV 83–4512; *Hill,* No. CV 84–0361; *Mormoris,* No. CV 85–2660; *White,* No. CV 85–2661; *Podell,* No. CV 85–2662; *Stone,* No. CV 85–2663; *Jacqueline Ferguson v. Secretary,* No. CV 86–0605; and *Aaron Green,* No. CV 86–2084.

18. The *Hickman* court also deemed it significant that the Secretary had substituted the word "money" for the word "cash" in § 416.1103(f) since both the Social Security Act and the regulations consistently use the word "cash" whenever a distinction is drawn between "cash income" and "in-kind income." The court stated:

> [T]he word "cash" has special meaning under the [Social Security Act], distinguishing cash receipts from all other kinds. The fact that "cash" was *not* used in section 416.1103(f) provides a possible clue to the intended scope of this section. If the drafters had meant to draw the distinction the Secretary insists upon, the use of the word "cash" would have been more likely.

*Id.* at 1382 n. 8.

recipients, therefore, will often have more accessible to them in-kind goods such as some extra foodstuffs or clothing or a small space for the recipient to live in than the disposable cash that the Secretary has been requiring be the basis for a *bona fide* loan.[19]

It is true that courts generally defer to an agency's interpretations of the statute it is empowered to administer and the regulations it may promulgate under that statute. *E.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, such deference "cannot be allowed to slip into a judicial inertia," and courts must be careful not to "rubber stamp....administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *American Ship Building Co. v. National Labor Relations Board*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965), and *National Labor Relations Board v. Local Union No. 103, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978)). *See also* 5 K. Davis, *Administrative Law Treatise*, ch. 29, § 29:16 (2d ed. 1984). While the SSA may be genuinely concerned with possible abuses of the SSI program, it may not reasonably or justifiably claim such concern as a basis for a policy that reduces the availability of SSI benefits in a manner that flies in the face of the language and spirit of the Social Security Act and the Secretary's own regulations. Accordingly, the Court holds that the definition of a "loan" for SSI purposes cannot be restricted solely to cash transactions but also covers arrangements involving the borrowing of in-kind support and maintenance provided, of course, that the circumstances presented by a given SSI recipient's situation demonstrate the existence of the other necessary elements of a valid loan.[20]

## F. Effects of Jackson v. Schweiker and SSA's "Nonacquiescence" Policy

Many of the individual *Ruppert* plaintiffs place a good deal of reliance upon the Seventh Circuit's decision in *Jackson v. Schweiker*, 683 F.2d 1076 (7th Cir.1982), that the Secretary's treatment of the difference between the fair market rental value of SSI recipients' housing and the rent actually paid for shelter as unearned in-kind countable income is not consistent with certain other of the Secretary's regulations that the Seventh Circuit deemed to be more proper implementations of the Social Security Act, and that only income that is "actually available" to meet the "basic needs" of an SSI recipient and in reality increases the recipient's "purchasing power" may be attributed to the individual. Plaintiffs seek that this Court adopt the holding and reasoning of *Jackson* in the context of the instant cases. Also, plaintiffs contend that, in violation of the policy set forth in SSA Interim Circular No. 185 (June 3, 1985) ("Circular No. 185" or "the Circular") and OHA Staff Guides and Programs Digest Bulletin No. III–I (August 22, 1986) ("Bulletin No. III–I" or "the Bul-

---

19. In his report and recommendation concerning the appropriate disposition of plaintiff Matthew Stone's lawsuit against the Secretary, Magistrate Jordan went so far as to say, "The requirement that a loan be made in money lacks any rational basis in terms of the real world...." Report and Recommendation to Judge Wexler in *Stone*, No. CV 85–2663, slip op. at 3 (E.D.N.Y. February 25, 1987).

20. The Court's holding does not in any way imply that the mere fact that a relative or friend supplies some kind of in-kind support and maintenance to an SSI claimant necessarily signifies the presence of a loan for SSI purposes.

The existence of a *bona fide* loan must be determined based upon the specific facts of individual SSI recipients' situations. As the Fifth Circuit declared in *Hickman:*

We do not believe the present decision now allows every recipient of SSI who receives in-kind support .... to collect [the] full [amount of the] benefits [they seek].... SSI recipients still must show that any in-kind support received was, in fact, loaned to them in realistic anticipation of repayment, and that they indeed intend to repay.

803 F.2d at 1382.

letin"), the Secretary has refused to refer the issue of the proper treatment of certain kinds of imputed in-kind income to the SSA's Special Policy Review Committee, and, apparently, wish the Court to enter an order requiring the Secretary to do so.[21]

■ As plaintiffs' counsel should be well aware, however, the Second Circuit has already indicated, in a previous case Robert handled, that it does not find *Jackson* persuasive, but rather considers the holdings of other circuits that in-kind income should be includable in countable income where it constitutes "actual economic benefit" to an SSI recipient to be more sound. *Rothman v. Schweiker*, 706 F.2d 407, 410 (2d Cir.) (per curiam), *cert. denied sub. nom., Guigno v. Heckler*, 464 U.S. 984, 104 S.Ct. 428, 78 L.Ed.2d 362 (1983) (citing *Buschmann v. Schweiker*, 676 F.2d 352, 355 (9th Cir. 1982); *Nunemaker v. Sec. HEW USA*, 679 F.2d 328, 332–33 (3d Cir.1982); *Usher v. Schweiker*, 666 F.2d 652, 655–57 (1st Cir. 1981); and *Kimmes v. Harris*, 647 F.2d 1028, 1033–34 (10th Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 400, 70 L.Ed.2d 214 (1981)).[22] In the opinion of this Court, the Second Circuit's decision in *Rothman* precludes it from applying *Jackson* to the *Ruppert* cases in the manner which plaintiffs desire.[23]

As for Circular No. 185 and Bulletin No. III–I, a close reading of these documents makes clear their irrelevancy to the cases now at bar. The SSA issued Circular No. 185 as part of a re-examination of SSA policy spurred by congressional, judicial, and public concern over the SSA's "nonacquiescence" in judicial constructions of the Social Security Act and its accompanying regulations. In the Circular's introductory section, the SSA declares that the procedures the Circular establishes signify a modification of the SSA's policy toward court decisions that are at variance with established SSA procedures. The Circular states that:

> A series of Social Security Rulings (SSRs) will be issued identifying circuit court decisions which are at variance with established SSA policy (i.e., the law, Regulations and SSRs) for each of the circuits and which will be considered at the Administrative Law Judge (ALJ) and Appeals Council (AC) levels. These SSRs will provide a full description of the case and an explanation of how SSA will apply the decision in the circuit.

The Circular then goes on to set forth the procedures ALJs and the SSA Appeals Council should follow where SSA policy is apparently at odds with circuit court case law in the circuit in which a Social Security claimant resides. The Circular notes that an SSA Special Policy Review Committee will review agency decisions where a conflict appears to arise between the result called for under circuit court case law and that which SSA policy seems to warrant and decide whether a particular claimant's application is an appropriate vehicle for relitigating the issue. *See* Note, *supra* p. 19, at 214–22 for discussion of Circular No. 185.

As of August 22, 1986, Bulletin No. III–I superceded Circular No. 185. However, besides denominating the SSRs discussed in the Circular as "Acquiescence Rulings" and clarifying the procedures to be followed regarding Acquiescence Rulings designed to be applied at all administrative levels, not just at the ALJ and Appeals Council levels, the Bulletin makes little or no substantive revisions to the Circular.

Circular No. 185 and Bulletin No. III–I, therefore, address the matter of SSA compliance with appellate level decisions within each of the various individual circuits. Thus, contrary to plaintiffs' contentions,

---

21. *See, e.g.,* papers filed in *Ruppert,* No. CV 81–3479; *Alan Green,* No. CV 83–0998; *Karnett,* No. CV 83–4512; *Hill,* No. CV 84–0361; *Mormoris,* No. CV 85–2660; *White,* No. CV 85–2661; *Podell,* No. CV 85–2662; *Stone,* No. CV 85–2663; and *Aaron Green,* No. CV 86–2084.

22. *See supra* pp. 163–64 and 165 and note 5.

23. Although plaintiffs' counsel is obviously entitled to attempt to distinguish *Rothman* from the cases currently before this Court, plaintiffs' assertion throughout their papers that "[t]he Second Circuit was most clear in its *Rothman* holding that it did not disagree with the Seventh Circuit['s]" decision in *Jackson* seems rather fallacious.

*Jackson,* which was a class action brought on behalf of SSI applicants and recipients in the State of Indiana, is relevant for purposes of the Circular and the Bulletin that supercedes it only insofar as subsequent SSA actions taken within the jurisdiction of the Seventh Circuit are concerned. Similarly, the Second Circuit's decision in *Rothman,* if it is in any way in conflict with SSA policy, is material under the procedures set forth in Circular No. 185 and Bulletin No. III–I only to the extent that the SSA's functioning within the Second Circuit is implicated. Nothing contained in the two SSA documents addresses itself to the question of the most appropriate approach the SSA should take where two or more circuits take different or even irreconcilable views as to the legitimacy of certain aspects of the Secretary's administration of the programs established by the Social Security Act. Plaintiffs' reading of SSA policy notwithstanding, it is manifest that Circular No. 185 and Bulletin No. III–I concern themselves solely with the issue of SSA acquiescence or nonacquiescence with adverse circuit court rulings *within the circuit;* the documents do not at all speak to the problem of *inter-circuit* differences of interpretation and the proper SSA response. Plaintiffs' assertion that the Circular and the Bulletin establish a Special Policy Review Committee for the purpose of making policy decisions regarding the

SSA's response to disparate decisions by different circuit courts of appeals is, quite simply, inaccurate.[24]

## IV. ISSUES INVOLVING PLAINTIFFS' COMPETENCY AND ROLE OF NEW YORK STATE IN LITIGATION

### A. *Necessity for Appointment of Guardians Ad Litem*

In a number of the report and recommendations he has prepared, Magistrate Jordan has raised questions regarding individual plaintiffs' mental competency. In certain of the cases, the Magistrate has ordered that a guardian *ad litem* be appointed to protect the plaintiff's interests, then proceeded to issue a report and recommendation suggesting an appropriate disposition of the case after someone stepped forward to act in a guardianship capacity.[25] In two of the cases, where no such person could be found, Magistrate Jordan recommended that the individual plaintiffs' actions be dismissed without prejudice until persons willing and able to act as guardians *ad litem* for these plaintiffs could be located.[26] In two other cases, the Magistrate took note of the litigants' "marginal" competency, but did not order that guardians *ad litem* be appointed.[27]

Plaintiffs' counsel's position concerning the necessity of the appointment of guardians *ad litem* has been somewhat inconsist-

**24.** Having found that the SSA's policy as set forth in Circular No. 185 and Bulletin No. III–I does not require the Secretary to refer the issue of the proper treatment of certain kinds of imputed in-kind income to the Special Policy Review Committee for direction as to how the SSA should handle the fact that different circuits have apparently reached different conclusions concerning the propriety of the Secretary's treatment of such income, the Court need not address the question of whether, if it were inclined to do so, the Court would possess the power to order the Secretary to refer the issue to his Special Policy Review Committee.

Also, it may be worthy of note that while "intra-circuit nonacquiescence," that is, agency nonacquiescence in a circuit court decision in the form of refusing to follow the decision in subsequent cases within the circuit issuing the ruling, has been strongly condemned, courts have generally accepted the validity of "inter-circuit nonacquiescence," *i.e.,* an agency's refusal to alter its administration of a governmental

program so as to bring its actions into nationwide conformance with a particular circuit court decision. *See* Note, *supra* pp. 162–63, at 197– 98; Note, *Administrative Agency Intracircuit Nonacquiescence,* 85 Colum.L.Rev. 582, 583 n. 10 (1985) (citing Commission on Revision of the Federal Court Appellate Systems, Structure and Internal Procedures: Recommendations for Change, 67 F.R.D. 195 (1975)).

**25.** *See* Orders, Orders to Show Cause, Decision and Orders, and Report and Recommendations issued in *Karnett,* No. CV 83–4512; *Podell,* No. CV 85–2662; *Shaw v. Secretary,* No. CV 85–2664; and *Lo Brutto,* No. CV 86–0604.

**26.** *See* Orders and Report and Recommendations issued in *DeFeo v. Secretary,* No. CV 84–1253; and *White,* No. CV 85–2661.

**27.** *See* Decision and Orders and Report and Recommendations issued in *Alan Green,* No. CV 83–0998; and *Stone,* No. CV 85–2663.

ent. In some of the cases, he has filed on behalf of his clients letters and affidavits objecting to Magistrate Jordan's ordering that a guardian *ad litem* be appointed. In the cases involving litigants whom the Magistrate described as "marginally" competent, on the other hand, plaintiffs' counsel himself has suggested the appointment of such guardians.[28] Additionally, plaintiffs' counsel has proposed that, if the Court is of the opinion that the appointment of guardians *ad litem* is indeed necessary for certain plaintiffs who have so far been unable to obtain such representatives, New York State Department of Social Services Commissioner Cesar Perales ("State Commissioner") or a designee of the State Commissioner should be required to act in such a capacity given New York State's duty to protect its citizens in a *parens patriae* role.[29] The State Commissioner has registered strong objections to plaintiffs' counsel's suggestion.[30]

■ Fed.R.Civ.P. 17(c) gives district courts the authority to "appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or .... make such other order as it deems proper for the protection of the infant or incompetent person." The appointment of such a guardian *ad litem* is not mandatory; rather, a court may in its discretion decide that the circumstances surrounding given litigation indicate that some other form of protection of an incompetent's interests would be more appropriate or that appointment of a guardian is simply unnecessary. *E.g., Foe v. Vanderhoof,* 389 F.Supp. 947 (D.Colo.1975); *United States v. Noble,* 269 F.Supp. 814 (E.D.N.Y.1967).

■ The Court finds that, in the context of the cases now at bar, appointment of guardians *ad litem* for various of the plaintiffs is not warranted. Charles Robert has for a number of years vigorously pursued the legal remedies available to the plaintiffs in the *Ruppert* cases and other litigants seeking benefits under the Social Security Act and, for the most part, has capably protected the legal interests of numerous of society's more unfortunate members, both competent and incompetent. The need for the oversight of litigation by a guardian *ad litem* is far more pressing where, unlike the situation the *Ruppert* cases present, an incompetent becomes involved in litigation without representation or his purported representative's interests actually or potentially conflict with those of the party himself. *See, e.g., Matter of Chicago Rock Island and Pacific Railroad Co.,* 788 F.2d 1280 (7th Cir.1986); *cf. Metropolitan Life Insurance Co. v. Harris,* 446 F.Supp. 936 (E.D.Wis.1978) (guardian *ad litem* appointed for two unrepresented minors in life insurance policy interpleader action). Moreover, it cannot reasonably be said that representation by an attorney is insufficient protection of an incompetent party's interests given that the state courts of New York have appointed litigants' lawyers to serve the dual function of legal counsel and guardian *ad litem* in the same case. *E.g., Reton v. Kirby,* 88 A.D.2d 979, 451 N.Y.S.2d 795 (2d Dep't 1982) (attorney appointed guardian *ad litem* for senile litigant he was representing).[31]

■ Additionally, the appointment of guardians *ad litem* at this stage in this litigation would serve little purpose. The *Ruppert* cases are before the Court essen-

---

**28.** Compare plaintiffs' papers filed in *DeFeo,* No. CV 84–1253; *White,* No. CV 85–2661; and *Podell,* No. CV 85–2662, with those filed in *Alan Green,* No. CV 83–0998; and *Stone,* No. CV 85–2663.

**29.** *See, e.g.,* papers filed in *DeFeo,* No. CV 84–1253; and *White,* No. CV 85–2661.

**30.** *See* Assistant Attorney General Mary Fisher Bernet's letters dated May 22, 1987 filed in connection with *DeFeo,* No. CV 84–1253; and *White,* No. CV 85–2661.

**31.** Fed.R.Civ.P. 17(b) provides that:

The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held [with exceptions not relevant to this litigation].

tially for review of administrative decisions and rulings regarding certain legal issues. The individual plaintiffs have nothing to lose by pursuing their legal actions, and settlement of the disputes does not appear at all likely. It is not clear, therefore, what exactly the appointment of guardians to oversee any remaining stages of plaintiffs' lawsuits would accomplish, assuming that persons to act in such a capacity could even be obtained.[32] *Cf. In re Tyler*, 49 Misc.2d 510, 267 N.Y.S.2d 457 (Sup.Ct.N.Y.Co.1966) (declining to appoint guardian *ad litem* where appointment unnecessary and it would be difficult to obtain such a guardian). Furthermore, court appointed guardians *ad litem* are entitled to fees for their services, which, if a party is successful in his suit, are usually paid out of the amount recovered or taxed as costs against the party's adversary, 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1570 (1971), and federal district courts have an obligation to reduce the costs of litigation by avoiding the unnecessary appointment of guardians *ad litem*, *Noble*, 269 F.Supp. 814; *cf. In re Becan*, 26 A.D.2d 44, 270 N.Y.S.2d 923 (1st Dep't 1966) (where appointment of guardian *ad litem* is unnecessary, it is improper to burden incompetent's estate with expenses incidental to such appointment).

Accordingly, the Court will allow plaintiffs' cases to proceed without requiring representation by guardians *ad litem*, be they private persons or individuals acting on behalf of the State of New York in its *parens patriae* role. The guardian *ad litem* appointed by Magistrate Jordan in several of the cases is hereby discharged of her duties but, if she deems it appropriate, may petition the Court for a reasonable fee for her services within twenty days of the entry of this decision. Counsel for plaintiffs shall supply the appointed guardian *ad litem* with a copy of the decision immediately upon its receipt.

### B. *Joinder of State Commissioner as "Involuntary Plaintiff"*

In addition to seeking that the Court appoint the State Commissioner or his designee guardian *ad litem* for any plaintiffs the court might find in need of such a representative, plaintiffs' counsel has sought to ally New York State with plaintiffs' interests by moving the Court for an order joining the State Commissioner as an "involuntary plaintiff" in the *Aaron Green* case, No. CV 86–2084, pursuant to Fed.R. Civ.P. 19. Rule 19, entitled *"Joinder of Persons Needed for Just Adjudication"*, reads, in relevant part, "(a) *Persons to be Joined if Feasible....* If [a] person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff."

Rule 19(a)'s involuntary plaintiff device, however, is not properly available to plaintiff Aaron Green. The case law makes clear that the involuntary plaintiff procedure may come into play only if the party sought to be joined is not subject to the Court's jurisdiction. If valid service is possible, the party should be served as a defendant and the Court will later realign the parties as may be necessary. *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 468, 46 S.Ct. 166, 169, 70 L.Ed. 357 (1926); *Cilco, Inc. v. Copeland Intralenses, Inc.*, 614 F.Supp. 431, 433 n. 2 (S.D.N.Y.1985). The State Commissioner is clearly within the jurisdiction of this Court and could have been joined as a defendant to Green's lawsuit.

Furthermore, it should be noted that many of the plaintiffs in these actions originally named the State Commissioner (or his predecessor) as a defendant in their complaints. Judge Altimari dismissed plaintiffs' claims against the State Commissioner in his July 16, 1985 decision but granted plaintiff Hill leave to file a second amended complaint setting forth one of

---

**32.** Leonard S. Clark, the Executive Director of the Nassau/Suffolk Law Services Committee, a potential source of guardians *ad litem* for litigants such as the plaintiffs in this litigation, has indicated that limited resources unfortunately make it impossible for members of his organization to serve in such a capacity.

Hill's claims against the State Commissioner and the Commissioner of the Suffolk County Department of Social Services ("Suffolk Commissioner") with greater specificity. Hill eventually filed an amended complaint again naming the State Commissioner and Suffolk Commissioner as defendants, and plaintiffs Edward and Rose Faicco, whose case is not covered by Judge Altimari's decision, also designate the State Commissioner as a defendant. Plaintiffs' counsel has asserted that each of the *Ruppert* cases is "related" and that each should be assigned to and decided by a single Judge of this Court. In accordance with counsel's assessment of the connection between the numerous cases he has filed, the various Judges of the Court have, on the whole, agreed to have any of the allegedly related actions pending before them reassigned to this Judge. It would appear more than somewhat incongruous if, after this Court entered an order dismissing the State Commissioner as a defendant in many of these purportedly related lawsuits, and while it had before it two individual *Ruppert* cases that still contain claims against the State Commissioner, the Court were to order the State Commissioner joined as a plaintiff in one of the actions.

Plaintiff Aaron Green's motion for joinder of the State Commissioner as an involuntary plaintiff must therefore be denied.[33]

### C. *Plaintiff Hill's Claim Against State Commissioner*

Plaintiff Hill's second amended complaint contains not only a claim against the Secretary concerning his allegedly improper actions in handling plaintiff's SSI applications, but also an assertion that the State Commissioner and Suffolk Commissioner violated 42 U.S.C. § 1396a(a), which concerns the contents of state plans for medical assistance, by improperly computing Hill's income for purposes of the granting of Medicaid benefits. The Medicaid program, which Congress established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396s, as a means of providing medical care and services to aged, blind, or disabled persons whose income and resources are insufficient to meet the costs of necessary medical services, is administered by participating states under approved state plans that must comply with all applicable federal laws and regulations governing eligibility for and payment of Medicaid benefits. The State Commissioner moved for judgment on the pleadings and, after consideration of the State Commissioner's motion and Hill's opposition to it, Magistrate Jordan issued a report and recommendation concluding that plaintiff's action against the State Commissioner should be dismissed for failure to state any federally cognizable cause of action. Report and Recommendation to Judge Wexler in *Hill*, No. CV 84–0361, slip op. (E.D.N.Y. October 16, 1986).

 The Court agrees with Magistrate Jordan's conclusion that plaintiff's case should be dismissed as against the State Commissioner, but for different reasons than those upon which the Magistrate relied. The Eleventh Amendment to the United States Constitution reads, "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The United States Supreme Court has interpreted the language of the Amendment as barring not only lawsuits brought against a state by citizens of other states, but also suits brought by a state's own citizens. *E.g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662

---

**33.** The State Commissioner has requested that the Court award him attorneys fees for having to respond to Green's motion. The State Commissioner's request is denied. The Court is aware that the relations between counsel for the parties in the *Ruppert* cases has been, to put it mildly, somewhat acrimonious at times, and that the history of the litigation includes challenges concerning adversaries' ethics, motions for formal censure, requests for the awarding of sanctions under Fed.R.Civ.P. 11, and a good deal of out and out name calling. For the Court to award attorneys fees to one party on a single relatively small aspect of this complex and protracted litigation at this stage of these legal proceedings would merely result in the restoking of fires that counsel rightfully should have damped down a long time ago.

(1974); *Employees v. Department of Health and Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment prohibits not only litigation brought against a state in its own name, but also that brought against state officials insofar as the relief sought entails a monetary award out of state funds. *See, e.g., Edelman,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662. The Amendment, however, limits federal court jurisdiction only over lawsuits against states, not over actions naming as defendants counties or other local governmental entities. *E.g., Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. · 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *see also Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Eleventh Amendment does not bar § 1983 suits against municipalities and other local governmental entities).

■ Hill's second amended complaint seeks as relief against the State Commissioner that she retroactively be granted Medicaid benefits to which she claims to be entitled.[34] The Social Security Act and the relevant federal regulation make states such as New York that participate in the Medicaid program responsible for approximately fifty percent of the cost of Medicaid benefits not paid for by the federal government. 42 U.S.C. § 1396d(b); 42 C.F.R. § 433.10. Under New York state law, the State splits the costs for which it is responsible equally with the local social services districts and thus must ultimately pay roughly twenty five percent of the costs of Medicaid benefits out of the State's treasury. N.Y.Soc.Serv.L. §§ 368–a(1)(d), (3)(b). The Eleventh Amendment thus unquestionably bars Hill's action to the extent that she seeks that the State Commissioner be required to make an award of retroac-

tive Medicaid benefits. *See Friedman v. Perales,* 616 F.Supp. 1363 (S.D.N.Y.1985); *Calkins v. Blum,* 511 F.Supp. 1073 (N.D.N.Y.1981), *affirmed,* 675 F.2d 44 (2d Cir. 1982); *Markel v. Blum,* 509 F.Supp. 942 (N.D.N.Y.1981); *cf. Florida Department of Health and Rehabilitation Services v. Florida Nursing Home Association,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132, *rehearing denied,* 451 U.S. 933, 101 S.Ct. 2008, 68 L.Ed.2d 319 (1981).

Accordingly, the Court grants the State Commissioner's motion for judgment on the pleadings and dismisses Hill's action against him.

## V. RESOLUTION OF INDIVIDUAL CASES

The Court so far has summarized the background of the *Ruppert* cases and outlined the statutory and regulatory framework relevant to them, considered plaintiffs' generalized challenges to the Secretary's actions concerning the awarding and calculation of SSI and New York supplementary assistance benefits, and addressed issues involving the mental competency of certain of the individual plaintiffs and the role of New York State in this litigation. The Court can now finally turn to the specific factual circumstances the individual *Ruppert* cases involve and determine whether each individual plaintiff is entitled, given the statutory and regulatory scheme and "substantial evidence" standard discussed above, to a judicial order granting him the benefits he seeks.

The parties are presumably familiar with the situation each specific *Ruppert* case presents, and any precedental value or guidance for future litigants the Court's opinion contains undoubtedly lies in its discussion of the broader issues this litigation raises and not in individualized holdings regarding the merits of given plaintiffs' claims. Accordingly, and because the Court's opinion is already rather lengthy, the Court will not long dwell on the partic-

---

**34.** Hill also seeks that the Court order the defendants named in her action to submit certified copies of the transcripts of four federal and state administrative hearings held in connection with her applications for benefits. The transcripts in question have either already been received by the Court or are not necessary for the adjudication of Hill's claim. *See infra* § V(E).

ulars of the various individual plaintiffs' actions, but attempt to set forth the circumstances surrounding an individual plaintiff's claim only to the extent that they are central to the Court's ruling on the merits of that plaintiff's appeal from the denial or reduction of his benefits.

### A. *Ruppert, No. CV 81–3479*

On August 24, 1979, Mary Ruppert filed an application for SSI benefits. On April 21, 1980, ALJ I. Bradford Spielman ruled that Ruppert is entitled to benefits because of her mental retardation and Ruppert began to receive the benefits for which she had applied. In a notice dated May 13, 1980, however, the SSA informed Ruppert that, beginning in January 1980, her income, including the income of her parents deemed countable income to her, exceeded the maximum level permissible for receipt of SSI benefits. This determination was affirmed upon reconsideration.

Ruppert then requested a hearing before an ALJ who would consider her case *de novo.* Such a hearing was held in front of ALJ James Manos on January 13, 1981. In a decision dated May 5, 1981, ALJ Manos found that from January through September 1980 Ruppert was a student who lived with her parents and thus was not eligible for SSI benefits due to the excess countable income deemed from her parents. The ALJ further found that Ruppert again became entitled to benefits on October 1, 1980 because, under the 1980 amendments to the Social Security Act, she is no longer subject to the income deeming provisions of the act. ALJ Manos's decision became the final determination of the Secretary when, on August 21, 1981, the SSA Appeals Council declined to grant Ruppert's request for review.

Prior to October 1980, the Social Security Act provided that:

For purposes of determining eligibility for and the amount of benefits for any individual who is a child under age 21,

such individual's income and resources shall be deemed to include any income and resources of a parent of such individual (or the spouse of such a parent) who is living in the same household as such individual, whether or not available to such individual, except to the extent determined by the Secretary to be inequitable under the circumstances.

42 U.S.C. § 1382c(f)(2). The 1980 amendments to the Social Security Act lowered the relevant age to eighteen. The act states that, in order to be considered a child, an individual must neither be married nor the head of a household and must either be (a) under the age of eighteen or (b) under the age of twenty two and a student who is regularly attending a school, college, or university or is receiving vocational or technical training that is designed to prepare the individual for gainful employment. 42 U.S.C. § 1382c(c). *See also* 20 C.F.R. § 416.1050 (1979); 20 C.F.R. § 416.1056 (1980); 20 C.F.R. § 416.1060 (1980); 20 C.F.R. § 416.1061(a) (1981); 20 C.F.R. § 416.1101 (1987).[35]

Mary Ruppert turned twenty on March 26, 1980 and was not married at the time in question. The issue of whether her parents' income should be deemed to her for the period between January 1980 and the end of September of that year in the SSA's consideration of Ruppert's eligibility for SSI benefits thus turns upon whether she should be viewed as a student for purposes of the SSI program and whether she is living in her parents' household. Both student status and residence in her parents' household must be present if Ruppert's parents' income may be properly counted in calculating Ruppert's entitlement to SSI benefits.

■■■ The ALJ's conclusion that Ruppert was a student for the nine month period of January through September 1980 is not supported by substantial evidence on the record. The record indicates that Ruppert is borderline mentally retarded with an IQ

---

**35.** The Court has discussed the provisions addressing the eligibility of children for SSI benefits in this section concerning Mary Ruppert's individual action rather than in the opinion's introductory section on the statutory and regu-

latory framework relevant to the *Ruppert* cases in general because these particular provisions are pertinent only to this specific individual lawsuit.

of about seventy six and functions on about the fourth grade level. During the relevant period, she was attending a training program at the Contemporary Guidance Services, Inc. in New York City designed to enable her to work in a sheltered workshop. Although employment in a sheltered workshop does not necessarily indicate that an individual lacks the necessary skills and ability for employment that constitutes a substantial gainful activity, 20 C.F.R. § 416.973(c) (1986) (formerly codified at 20 C.F.R. § 416.932(c) (1980)), letters from Lisa Volpe of the Contemporary Guidance Services indicate that the goal of Ruppert's training was not competitive employment, of which she was not capable, but rather simply that she be able to work as a sheltered workshop employee.[36] Ruppert's parents' income, therefore, cannot be deemed to Ruppert under 42 U.S.C. § 1382c(f)(2) for the period of January through September 1980.

ALJ Manos correctly held that the 1980 amendments' lowering of the age for which deeming of parental income under 42 U.S.C. § 1382c(f)(2) is mandated excludes Ruppert from that deeming provision as of October 1, 1980 and that Ruppert is entitled to SSI benefits as of that date subject to deductions for her earned and unearned income. Although the ALJ ruled that Ruppert resides in her parents' household, he did not make any explicit findings concerning what income, earned or unearned, cash or in-kind, might subject Ruppert to any reduction in the level of SSI benefits to which she is entitled. Accordingly, upon remand, the Secretary must not only calculate the benefits which were wrongfully denied Ruppert for the period before October 1, 1980, but also determine the level of benefits which she may receive after that date.

The level of SSI benefits Ruppert should receive on remand depends, under the statutory and regulatory scheme the Court has previously outlined, on a variety of factors, two of which the parties have already raised as matters in dispute in Ruppert's case now before the Court. In order to provide guidance to the Secretary upon remand, the Court now rules that substantial evidence on the one hundred and eighty page administrative record that has already been compiled on Ruppert's individual claim supports the Secretary's determination that Ruppert is living in her parents' household. The Court further holds that substantial evidence demonstrates that Ruppert's parents provide plaintiff with in-kind support and maintenance in the form of food and shelter. ALJ Spielman found in his decision in April 1980 that Ruppert lives with her parents and receives free room and board from them. It was not until March of 1981, over two and a half years after Ruppert filed her application for SSI benefits, that the Ruppert family first claimed that plaintiff lives not with them but with an aunt. The Court defers to ALJ Manos's factual conclusion, which the record quite clearly supports, that any testimony or statements regarding a separate residence with the aunt are not credible. The record also lacks any substantial support for plaintiff's claim that she has rental liability to her parents and a loan

---

**36.** During the time relevant to Ruppert's claim, the Secretary defined "substantial gainful activity" as follows:

Substantial gainful activity refers to work activity that is both substantial and gainful. Substantial work activity involves the performance of significant physical or mental duties, or a combination of both, productive in nature. Gainful work activity is activity for remuneration or profit (or intended for profit, whether or not a profit is realized) to the individual performing it or to the persons, if any, for whom it is performed, or of a nature generally performed for remuneration or profit. In order for work activity to be substantial, it is not necessary that it be per-

formed on a full-time basis; work activity performed on a part-time basis may also be substantial. It is immaterial that the work activity of an individual may be less, or less responsible, or less gainful, than that in which he was engaged before the onset of his impairment.

20 C.F.R. § 404.1532(b) (1980). The current definition of the phrase does not differ in any significant respect. See 20 C.F.R. § 404.1532(b) (1987). Although the Social Security Act itself uses the phrase "gainful employment" rather than the Secretary's term "substantial gainful activity," it may reasonably be assumed that the two are equivalent for any purposes pertinent to Ruppert's action.

arrangement with her parents concerning such liability and their provision of food for her. Although, contrary to the Secretary's position, such a loan arrangement would be valid for SSI purposes even if no cash actually changed hands, *see supra* § III(E), there is simply no evidence on the record sufficient to show that the Ruppert family ever actually entered into any such legally enforceable loan agreement.

The Court therefore remands Ruppert's action to the Secretary for the purposes of calculating the SSI benefits to which Ruppert is entitled for the period of January through September 1980 and determining Ruppert's entitlement to SSI benefits starting October 1, 1980.[37]

### B. *Mauro, No. CV 82–2678*

In a decision dated April 19, 1982, ALJ Arthur S. Adler found that at the time of her application for SSI benefits, Angela Mauro was living with her mother in Lake Grove, New York. The rent for the mother and daughter's residence was $300.00 a month but Mauro did not pay her share because she had no income. Mauro's mother and brother supplied Mauro with food and shelter. When Mauro's mother died, Mauro became an individual living alone. When plaintiff received a retroactive SSI payment, she repaid to her brother $2,000.00 as past due rent with a balance of $1,000.00 still remaining. She did not, however, make any payments for the food, gas, electricity, and heating fuel she had received. Based on his findings, the ALJ held that Mauro was eligible for SSI benefits but, since she had received in-kind support and maintenance, her benefits should be reduced under the presumed value rule by one third plus $20.00 a month. The ALJ's decision became the final determination of the Secretary when, on July 7, 1982, the SSA Appeals Council denied Mauro's request for review.

The Secretary's final determination is supported by substantial evidence on the record. Mauro's payment of $2,000.00 to her brother as past due rent indicates the existence of a loan of in-kind support and maintenance in the form of rent. The record, however, does not contain any evidence tending to substantiate plaintiff's contention that Mauro ever repaid or intended to repay her brother, mother, mother's estate, or anyone else for the value of the food, gas, electricity, and heating fuel she received. 20 C.F.R. § 416.1130(b) includes such items in its definition of in-kind support and maintenance. *See supra* pp. 159–60. The Court, therefore, holds that the Secretary's motion for judgment on the pleadings in the *Mauro* case should be granted and Mauro's corresponding motion denied.[38]

### C. *Alan Green, No. CV 83–0998*

It is undisputed that, on August 1, 1980, Alan Green and his mother Sheila Green entered into a written agreement under which Green is to pay his mother $100.00 a month in rent for the room he occupies in his parent's home in Oceanside, New York and $125.00 a month for food. The only issue in the *Alan Green* case is whether substantial evidence supports ALJ Lester Rosen's holding that the fair market rental value of Green's living quarters is $135.00 a month and that Green therefore receives unearned income in the form of in-kind support and maintenance consisting of shelter in the amount of $35.00 a month, the difference between the fair market rental value of the premises and the rent Green actually agreed to pay.

The $135.00 fair market rental value figure derives from Sheila Green's statement on an SSA form she filled out on February 11, 1981 that, if she were to rent the room her son uses to someone else, she would charge "about [the] same or more ($135.00[) ]." Although Green's mother testified at the hearing before the ALJ that

---

**37.** This holding is essentially consistent with Magistrate Jordan's recommendation. *See* Report and Recommendations to Judge Wexler in *Ruppert,* No. CV 81–3479, slip ops. (E.D.N.Y. December 3, 1986 and February 6, 1987).

**38.** This holding is consistent with Magistrate Jordan's recommendation. *See* Report and Recommendation to Judge Wexler in *Mauro,* No. CV 82–2678, slip op. (E.D.N.Y. February 6, 1987).

she never told the SSA that the market value of the room was $135.00, the administrative record makes unequivocally clear that Sheila Green did indeed supply the SSA with that figure. SSA procedures provide that the landlord is to be the primary source of rental information necessary to calculate rental subsidies for SSI purposes, including information regarding fair market rental value, and that once a landlord supplies information as to the fair market value of the rental premises, other sources knowledgable about rental values should not be contacted. POMS Manual 00835.-380(C)(3)(b) (December 1983).[39] The ALJ's finding concerning the fair market rental value of Green's living quarters and Green's receipt of $35.00 a month in in-kind support and maintenance, which became the final determination of the Secretary when the SSA Appeals Council denied Green's request for review on January 11, 1983, is thus supported by the requisite substantial evidence. Accordingly, the Court grants the Secretary's motion for judgment on the pleadings in the *Alan Green* case and denies Green's motion.[40]

### D. *Karnett, No. CV 83–4512*

In a decision dated June 13, 1983, ALJ Joseph Halpern found that Cheryl Karnett lives with and rents two rooms from her parents in Uniondale, New York, pays $169.00 a month for rent, and receives $25.00 worth of food from her parents each month. The ALJ noted that Beatrice Karnett, plaintiff's mother, had stated at the hearing held before him that the $169.00 figure was arrived at because it is the maximum amount that the New York State Department of Social Services will provide an individual for rent, and ruled the actual monthly fair market value of the rented premises to be $180.00, a figure provided by a local real estate broker. The ALJ also rejected Karnett's position that the food should be considered the proceeds of a loan from her parents, holding that money must

actually change hands for a loan to be considered established and that the $25.00 worth of food constitutes in-kind income. ALJ Halpern concluded that Karnett had successfully rebutted the presumed value rule's presumption that the in-kind income she received is worth one third of her SSI benefits plus the amount of the general income exclusion and that Karnett is in receipt each month of in-kind support and maintenance in the sum of $36.00, *i.e.*, the $11.00 difference between the fair market value of her living quarters and the figure she actually pays her parents plus the $25.00 value of the food her parents provides her. The ALJ's decision became the final determination of the Secretary when the SSA Appeals Council denied Karnett's request for review on September 1, 1983.

The Court finds that the Secretary's final determination is supported by substantial evidence on the record even though it does not fully accept the ALJ's reasoning. The Secretary's ruling that the $11.00 difference between the $180.00 and $169.00 rental figures constitutes in-kind support and maintenance is fully justified. Where a landlord (in this case Karnett's parents) fails to supply information as to fair market rental value of rented premises, SSA procedures require that another knowledgable source be contacted. POMS Manual 00835.380(C)(3)(b). Karnett's parents did not provide the necessary information, and a local real estate broker undoubtedly qualifies as a knowledgable source.

The Secretary's conclusion that the food Karnett receives from her parents cannot be considered a loan is similarly supported by the administrative record, but not because Karnett and her parents did not actually exchange any cash. As the Court held above, *supra* § III(E), the definition of a loan for SSI purposes cannot be confined solely to cash transactions. Nonetheless, the Karnett's purported loan agreement regarding food fails to meet the requirement

---

**39.** *See supra* notes 3 and 8 for discussion of purposes, force, and validity of POMS manuals.

**40.** Magistrate Jordan recommended that Alan Green's case be remanded to the Secretary for evaluation of the evidence on the issue of the

reasonable rental value of the premises Green occupies. Report and Recommendation to Judge Wexler in *Alan Green,* No. CV 83–0998, slip op. (E.D.N.Y. February 25, 1987).

of New York law that a legally binding arrangement possess mutuality of agreement and obligation. Unlike the situation apparently surrounding Karnett's monthly rental liability to her parents, Karnett never actually incurred any liability for her parents' provision of food to her. The ALJ found, and the record demonstrates, that Karnett is mentally retarded and autistic. An individual with the limited mental and communicative capacities that Karnett possesses is clearly mentally and physically incapable of comprehending and agreeing to the terms and obligations of a loan arrangement involving the provision of food in exchange for a subsequent, conditional repayment out of anticipated governmental benefits.

The Court, therefore, will grant the Secretary's motion for judgment on the pleadings in *Karnett* and deny Karnett's similar motion.[41]

### E. *Hill, No. CV 84–0361*

Earlier in this decision, *supra* § IV(C), the Court addressed plaintiff Jocelyn Hill's claim against the State Commissioner and dismissed her complaint against that defendant. The Court will now turn to Hill's remaining claims against the Secretary and the Suffolk Commissioner.

Hill originally filed an application for SSI benefits on April 29, 1982. Her application was granted but, shortly thereafter, the SSA suspended her benefits on the ground that, prior to applying for benefits, Hill had made several transfers of money for the purpose of establishing eligibility for SSI. The SSA also found that Hill had received an overpayment of benefits in the amount of $298.35.

ALJ Jerome Feiner evaluated the evidence submitted and testimony presented in Hill's case in a thorough decision dated December 15, 1983. ALJ Feiner noted that Hill had sold her home in Blue Point, New York on October 16, 1981. Hill's net receipt from the sale was $15,540.24. Hill used this money to make four separate transfers in November 1981, namely, (1) an alleged payment in the amount of $2,108.60 to Home Health Aids, Inc. for home health care; (2) an alleged payment of $5,303.76 to Hill's father, purportedly in repayment of various debts; (3) a transfer of $4,696.24 to Hill's sister as repayment for a purported loan; and (4) an alleged payment of $1,200.00 for current and past due rent.

The ALJ concluded that Hill could not demonstrate by the clear and convincing evidence the Social Security Act and regulations require that these transactions were for a purpose other than an attempt to establish eligibility for SSI benefits and went so far as to question the authenticity of some of the alleged transfers. For instance, the documentary evidence Hill submitted contained four checks payable to Home Health Aids, Inc. but the aggregate amount of these checks totalled only $1,226.40, not $2,108.60. Hill produced no physical evidence of any underlying debt to her father. A letter from Hill to Charles Robert describes the payment to her sister as a gift. No copy of any check for rental charges was submitted and a welfare examiner indicated in a January 13, 1983 letter to the SSA that his agency had information that Hill was late in paying rent for only one month and no other rental arrears existed. Accordingly, the ALJ held that Hill possessed resources exceeding the $1,500.00 limit for SSI eligibility of an individual such as herself.

ALJ Feiner then focused his attention on the Secretary's entitlement to recovery of the SSI benefits Hill had obtained before the SSA suspended her benefits. Hill al-

---

41. This holding is consistent with Magistrate Jordan's recommendation. *See* Report and Recommendation to Judge Wexler in *Karnett,* No. CV 83–4512 (E.D.N.Y. May 19, 1987). It should also be noted that the parties in *Karnett,* as well as a number of the other cases, did not actually file motions for judgment on the pleadings under Fed.R.Civ.P. 12(c). By agreement of the parties involved in the *Ruppert* cases, however, Magistrate Jordan established a schedule for the submission of papers seeking the entry of judgment on the pleadings in each of the individual actions. Where one or more of the parties failed to submit papers by the established dates, the Magistrate deemed the parties to have moved for judgment on the pleadings and proceeded to prepare a report and recommendation based upon the administrative record relevant to the individual plaintiff's case and any papers that had been filed.

leged at the administrative level that she was unaware that her actions regarding the proceeds of the sale of her home had resulted in an overpayment of benefits. The ALJ found Hill's contention to be uncontroverted and therefore held that Hill was "without fault" in accepting the benefits and that she had not improperly failed to furnish material information to the SSA, made any incorrect statement that she knew or should have known was incorrect, or unreasonably failed to return an SSI payment. The ALJ further found that, since Hill's expenses exceed her income, adjustment or recovery of the overpayment would defeat the purpose of the SSI program by depriving Hill of income or resources required for ordinary and necessary living expenses.

█ The Court is of the opinion that the ALJ's decision, which became the final determination of the Secretary on April 10, 1984 when the SSA Appeals Council denied Hill's request for review, is completely supported by substantial evidence contained in the administrative record. The administrative proceedings and documents make manifest that the ALJ's decision rests on solid evidentiary ground regarding both the transfer of resources and overpayment issues and must be affirmed. Additionally, Hill has presented absolutely no evidence to the Court supporting a federal cause of action against the Suffolk Commissioner. The Court, therefore, holds that the Secretary and Suffolk Commissioner's respective motions for judgment on the pleadings in *Hill* should each be granted and Hill's parallel motion should be denied.[42]

## F. *DeFeo, No. CV 84–1253*

Anthony DeFeo's action is one of the two cases that Magistrate Jordan recommended be dismissed without prejudice until a person willing and able to act as a guardian *ad*

*litem* for the plaintiff could be obtained. *See supra* p. 171 and note 26. Given the Court's holding that it is not necessary that a guardian *ad litem* be appointed for any of the individual plaintiffs in the *Ruppert* cases, however, dismissal of DeFeo's lawsuit is not warranted.

The parties did not submit any briefs setting forth the specifics of their positions in DeFeo's case [43] and the Magistrate's report and recommendation does not deal with the ultimate merits of DeFeo's suit, *see* Report and Recommendation to Judge Wexler in *DeFeo*, No. CV 84–1253, slip op. (E.D.N.Y. April 9, 1987). The Court therefore finds referral of DeFeo's claim back to Magistrate Jordan for the purposes of establishment of a revised briefing schedule and preparation of a new report and recommendation to be the most appropriate course of action. The Magistrate shall submit his report and recommendation by no later than December 31, 1987.

## G. *Thomas Ferguson, No. CV 84–2635*

The facts surrounding plaintiff Thomas Ferguson's claim, as found by ALJ Joseph Halpern in a decision dated December 30, 1983, are as follows: Ferguson lives in a four room condominium in Medford, New York with his father and his sister Jacqueline.[44] Under a written arrangement the father and son entered into in April 1983, Thomas Ferguson agreed to pay his father $169.00 a month for rent and $100.00 a month for food. Ferguson's actual payments to his father, however, do not constitute a proportionate share of the household expenses. Accordingly, the ALJ held that Ferguson is receiving in-kind support and maintenance in the form of food and shelter from his father, in whose household he is residing, and that his SSI benefits must be reduced under the one third reduction rule.

---

**42.** Magistrate Jordan's recommendation is essentially consistent with the Court's holding. *See* Report and Recommendation to Judge Wexler in *Hill*, No. CV 84–0361, slip op. (E.D.N.Y. June 11, 1987).

**43.** *See supra* note 41 for a discussion of Magistrate Jordan's establishment of a schedule for the filing of motions for judgment on the plead-

ings and handling of cases in which one or more of the parties failed to submit such a motion.

**44.** Jacqueline Ferguson's claim for SSI benefits is also now before the Court. *Jacqueline Ferguson*, No. CV 86–0605. *See infra* § V(S).

The ALJ's decision, which became the final determination of the Secretary on April 12, 1984 when the SSA Appeals Council denied Ferguson's request for review, is supported by substantial evidence on the record. The ALJ's ruling accurately reflects the situation the record presents. For example, at the hearing before the ALJ, Ferguson's father testified that Ferguson would sometimes help out with the buying of food, but only "a little bit" and "there was nothing formal about it." Furthermore, the amount of rent Ferguson agreed to pay does not cover his proportion of the condominium's monthly carrying charges and it is questionable from the record whether the written agreement between the father and son has ever been enforced. The Court therefore grants the Secretary's motion for judgment on the pleadings in Thomas Ferguson's case and denies Ferguson's equivalent motion.[45]

## H. *Faicco, No. CV 84–3610*

ALJ Arthur S. Adler began his relatively detailed evaluation of Edward and Rose Faicco's situation by noting that the Faiccos were originally granted SSI benefits beginning October 1974. Following a redetermination in December 1982, the Faiccos were found initially and upon reconsideration to have each been overpaid $262.20 in monthly benefits because the government was not aware of certain in-kind maintenance and support their daughter had supplied them. According to Rose Faicco's testimony, on November 1, 1982, she and her husband began residing at a private house their daughter owned in Franklin Square, New York. Plaintiffs originally paid rent to their daughter in the amount of $350.00 a month, a figure that included payment for utilities and heat. In March 1983 the rent was reduced to $250.00 due to a lowering of the daughter's mortgage costs. The daughter testified that her mortgage payments had been $568.00 a month but were lowered to $533.00 as a consequence of a downward adjustment in her variable mortgage interest rate. The

daughter also testified that she did not reside with her parents and stated on an SSA form that the monthly expenses for the house totalled $951.00.

ALJ Adler found that, regardless of whether the Faiccos' rental agreement constituted a *bona fide* agreement, the evidence demonstrates that they had received countable in-kind support and maintenance in the form of shelter. If it were to be assumed that the agreement between the parents and daughter is *bona fide* and that the elder Faiccos live in their own household, their SSI benefits would have to be reduced under the presumed value rule because of the difference between the amount they are paying and the fair market value of the house as indicated by the daughter's statement of monthly expenses. Since the presumed value of the shelter as one third of the Faiccos' SSI benefits plus the general income exclusion is less than the actual value as measured by the difference between the amount of rent actually paid and the fair market rental value, the lower presumed figure governs. *See supra* p. 159. The situation is not changed even if one were to take into consideration the reduced expenses due to the lowered mortgage payments. The mortgage expenses decreased by $35.00 a month, but the daughter passed this reduction along to her parents in the form of a $100.00 rent deduction.

A similar conclusion would be warranted if it were assumed that the Faicco family's arrangement is not *bona fide* and that Edward and Rose Faicco should be considered for SSI purposes as living in their daughter's household. The rent the Faiccos are paying is less than their two thirds *pro rata* share of a three person household and the presumed value of the shelter they are receiving plus the general income exclusion is less than the difference between what they are paying and their proportionate share.

The ALJ therefore held that, regardless of how the agreement between the Faicco

**45.** This holding is consistent with Magistrate Jordan's recommendation. *See* Report and Recommendation to Judge Wexler in *Thomas Ferguson,* No. CV 84–2635, slip op. (E.D.N.Y. June 19, 1987).

family is viewed, the result of Edward and Rose Faicco's arrangement with their daughter is that the elder Faiccos each received SSI benefits in an amount of $262.00 more than that to which they were entitled for the period of November 1982 through March 1983. The ALJ further ruled that the Faiccos were not "without fault" in obtaining the overpayment because they had failed to comply with the requirement that SSI recipients report any changes in living arrangements, and, accordingly, the Faiccos were not eligible for waiver of adjustment or recovery of the sum overpaid. The ALJ's decision, which he handed down on January 17, 1984, became the final determination of the Secretary on June 26, 1984, when the SSA Appeals Council concluded that there was no basis for its granting the Faiccos' request for review.

 The Court finds that the Secretary's final decision is supported by substantial evidence on the record with regard to both the question of whether the Faiccos received in-kind support and maintenance in the form of shelter which led to an overpayment of benefits and the issue of whether waiver of adjustment or recovery of the overpayment is warranted. The relevant statutory and regulatory provisions and the facts contained in the administrative record indicate the soundness of the ALJ's reasoning concerning the existence of an overpayment as well as his conclusion the Faiccos were not without fault in causing the overpayment.

Additionally, it must be noted that, as the Court mentioned earlier in this opinion, *supra* pp. 173–74, the Faiccos filed their action not only against the Secretary but against the State Commissioner as well. However, although the Faiccos name the State Commissioner as a defendant in their complaint, plaintiffs never served the State Commissioner with process. Plaintiffs' action against this defendant, therefore, must be dismissed.

For these reasons, the Court holds that Edward and Rose Faicco's complaint against the State Commissioner must be dismissed for lack of service, the Secretary's motion for judgment on the pleadings in the Faiccos' action should be granted, and the Faiccos' motion for judgment on the pleadings should be denied.[46]

I. *Mormoris, No. CV 85–2660*

Margaret Mormoris filed an application for SSI benefits on December 3, 1980. The SSA originally denied Mormoris's application but, on September 10, 1981, an ALJ found that Mormoris is disabled and entitled to benefits retroactive to the date of her application. However, in calculating the level of benefits to which Mormoris is entitled, the SSA determined that the monthly payments of $140.00 that Mormoris's daughters Katherine and Pam had each been providing Mormoris to help her meet her expenses while her SSI application was pending constituted countable income and reduced Mormoris's benefits by $280.00 a month. In a decision dated April 28, 1982, ALJ S. Theodore Shapiro rejected the Mormoris family's claim that the sums the daughters supplied their mother were loans that they expected would be repaid out of the anticipated retroactive SSI benefits and upheld the SSA's treatment of the money as income. The ALJ's decision became the final determination of the Secretary on July 8, 1982 when the SSA Appeals Council denied Mormoris's request for review.

 The ALJ's decision is not supported by the necessary substantial evidence. The evidence the administrative record contains makes apparent the nature of the financial arrangement between Mormoris and her daughters. As the SSI application process slowly moved forward between December 3, 1980 and September 10, 1981, Mormoris found herself severely monetarily pressed. She turned for help during these months to her daughters, who themselves possess only relatively limited resources. The daughters agreed to provide Mormoris with $140.00 apiece with the

---

46. This holding is essentially consistent with Magistrate Jordan's recommendation. *See* Report and Recommendation to Judge Wexler in

*Faicco v. Secretary,* No. CV 84–3610 (E.D.N.Y. July 17, 1987).

full expectation that the monies advanced would be recouped out of the anticipated SSI income once Mormoris's application was finally approved. As Mormoris stated on an SSA form she filled out on October 20, 1981 while the SSA was considering the amount of benefits she should receive each month, "I have to pay my daughters back. I had always intended to pay them back because I assumed I would be receiving retroactive SSI benefits from 12/20 on. They had to suffer financial difficulty in order to help me out." Similarly both Katharine and Pam informed the SSA that they had always intended that the money be repaid as soon as their mother received the retroactive SSI benefits.

Accordingly, the Court will grant Mormoris's motion for judgment on the pleadings in her case and deny the Secretary's corresponding motion.[47]

### J. *White, No. CV 85-2661*

Olga White's action is the other case besides *DeFeo* that Magistrate Jordan recommended be dismissed without prejudice until such time as a person willing and able to act as a guardian *ad litem* for the plaintiff can be found. *See supra* p. 171, note 26, and § V(F). As with *DeFeo*, the Court orders that White's claim be referred back to the Magistrate so that he can establish a revised briefing schedule and prepare a new report and recommendation to be submitted by no later than December 31, 1987.[48]

### K. *Podell, No. CV 85-2662*

Lawrence Podell suffers from a psychiatric impairment and is institutionalized. Prior to Podell's receipt of SSI benefits in the fall of 1981, his mother sent the institution where Podell resides $30.00 each month to cover miscellaneous expenses, such as haircuts and movies, that Podell incurs. Podell argues that these $30.00 payments were loans which his mother later recouped out of Podell's SSI checks when they began to arrive. ALJ S. Theodore Shapiro found, however, in a decision dated July 29, 1982, that Podell's mother's payments were not loans and it was thus proper for the SSA to consider the $30.00 payments to Podell as countable unearned income received from his mother. The ALJ's decision became the final determination of the Secretary when the SSA Appeals Council denied Podell's request for review on January 6, 1983.

■ The Secretary's final determination is not supported by the requisite substantial evidence. It is true that the administrative record contains no direct indication that Podell entered into an agreement with his mother that the monthly payments she provided him were to be repaid out of the SSI benefits he expected subsequently to receive. Nonetheless, the record offers concrete proof, in the form of a letter from Podell's mother and copies of checks she wrote, that she did in fact obtain reimbursement for the money she sent to the institution for her son's benefit when Podell's SSI payments began. It can reasonably be inferred, therefore, that Podell and his mother did indeed enter into and adhere to a valid loan agreement.

■ Furthermore, the ALJ's conclusion that it is "highly unlikely that the claimant had the mental capacity to enter into an enforceable contract under State law" is purely speculative. The record contains no evidence concerning the exact nature of Podell's impairment. Also, the fact that Podell was only seventeen years old at the time the agreement with his mother was arranged does not mean, as the ALJ seems to have believed, that the agreement was not legally binding. A contract entered into by a minor is not necessarily void, but

---

**47.** Magistrate Jordan was of the opinion that substantial evidence did exist to support the ALJ's decision and recommended that the Court grant the Secretary's motion and deny Mormoris's motion. Report and Recommendation to Judge Wexler in *Mormoris,* No. CV 85-2660, slip op. (E.D.N.Y. February 6, 1987).

**48.** Unlike *DeFeo,* where neither the plaintiff nor the Secretary submitted any briefs detailing their specific contentions regarding the ultimate merits of the plaintiff's case, White has filed such a brief as well as a brief and affidavit containing objections to Magistrate Jordan's recommendation concerning the disposition of her case. The Secretary, however, has apparently failed to file any substantive papers in the *White* case.

merely generally voidable by the minor at any time prior to ratification. *E.g., Career Placement of White Plains v. Vaus*, 77 Misc.2d 788, 354 N.Y.S.2d 764 (Sup.Ct. Westchester Co.1974); *Petition of Yonnone*, 72 Misc.2d 579, 339 N.Y.S.2d 212 (Sur.Ct.Orange Co.1972); *Fisher v. Cattani*, 53 Misc.2d 221, 278 N.Y.S.2d 420 (D.Ct. Nassau Co.1966).

Accordingly, the Court hereby grants Podell's motion for judgment on the pleadings in his lawsuit and denies the Secretary's motion.[49]

### L. *Stone, No. CV 85–2663*

In a decision dated November 4, 1982, which became the final determination of the Secretary on February 22, 1983 when the SSA Appeals Council declined to review it, ALJ Arthur S. Adler found that, since the in-kind support and maintenance Matthew Stone received from his parents did not involve any exchange of cash, the arrangement between the family members could not be considered a loan for SSI purposes. The Court has held above, *supra* § III(E), that the definition of that which constitutes a loan for purposes of the SSI program cannot justifiably be restricted to cash transactions. Accordingly, the Secretary's decision cannot stand. Nonetheless, the Court does not deem it warranted that it appropriate for itself the Secretary and SSA's function as the primary fact finders when an individual seeks benefits made available by the Social Security Act. The Court, therefore, will not now attempt to ascertain whether Stone is entitled to the increased SSI benfits he seeks. Rather, the Court remands Stone's action to the Secretary with directions that

he consider whether Stone's SSI benefits should be reduced notwithstanding the Court's holding that the definition of a loan for SSI purposes covers arrangements involving the borrowing of in-kind support and maintenance or whether Stone is indeed entitled to the increased benefits he desires.[50]

### M. *Shaw, No. CV 85–2664*

In a decision dated January 29, 1983, ALJ S. Theodore Shapiro found that Victoria Shaw is living in the household of her parents and is receiving in-kind support and maintenance from them. ALJ Shapiro rejected Shaw's contention that she has rental liability to her parents of $169.00 per month and that she has a loan arrangement with her parents regarding rent payment. The ALJ further rejected Shaw's assertion that she buys and prepares her own food separately from her parents. Based on his findings, the ALJ held that, because Shaw is living in her parents' household and receiving in-kind support and maintenance from them, she is not entitled to the increased SSI benefits she seeks. The ALJ's decision became the final determination of the Secretary when, on May 23, 1983, the SSA Appeals Council declined to review the ALJ's ruling.

The Court finds the Secretary's final determination to be supported by the required substantial evidence. The record contains clear evidence, including a *New York Times* article about plaintiff's father, Arvel Shaw, that Shaw was born autistic and, although she can dress and feed herself, she is unable to cook or talk and has "no idea of money."[51] Shaw is thus mani-

---

**49.** Magistrate Jordan recommended that the Court grant the Secretary's motion and deny Podell's motion. Report and Recommendation to Judge Wexler in *Podell*, No. CV 85–2662, slip op. (E.D.N.Y. April 14, 1987).

**50.** In his report and recommendation, Magistrate Jordan advocated that the Court reject the Secretary's position that a loan must be made in cash but went on, based upon his own evaluation of the weight of certain potentially conflicting evidence and analysis of what he believed to be the controlling law and regulations, to recommend that the Court nevertheless deny Stone's motion for judgment on the pleadings

awarding him full SSI benefits without reduction and granting the Secretary's corresponding motion to the contrary. *See* Report and Recommendation to Judge Wexler in *Stone*, No. CV 85–2663, slip op. (E.D.N.Y. February 25, 1987). *See also* Magistrate Jordan's Decision and Order dated April 29, 1987.

**51.** Arvel Shaw is a bassist who is best known for having played for many years with Louis Armstrong's band, but who has also, among other things, worked in the orchestras of a number of Broadway musicals, and led his own trio. A July 23, 1983 *New York Times* article about Arvel and Victoria Shaw, entitled "Arvel Shaw:

festly incapable of entering into a loan arrangement enforceable under New York law regarding the shelter that her parents provide her or obtaining her own food separate and apart from her parents.[52]

Accordingly, the Court holds that the Secretary's motion for judgment on the pleadings in the *Shaw* case should be granted and that Shaw's similar motion should be denied.[53]

### N. *Zimmerman, No. CV 85–2665*

In a decision dated March 30, 1983, ALJ Robert H. Straus considered Steven Zimmerman's claim for increased SSI benefits. The ALJ found, based on the relevant testimony and exhibits, that Zimmerman resides with his parents in Valley Stream, New York and contributes $300.00 a month towards household expenses in the form of $200.00 for rent and $100.00 for food. These payments, however, do not constitute his proportionate one third share of the household expenses, which total $1,388.00 including expenditures for food, mortgage, heating gas, electricity, and water. Accordingly, the ALJ held that Zimmerman must be considered for SSI purposes to be living in his parents' household and receiving in-kind support and maintenance and thus the SSI benefits to which he would otherwise be entitled must be reduced under the one third reduction rule.

The ALJ further concluded that, even if he were to accept Zimmerman's contention that the difference between the amount he paid to his parents and his proportionate share of the household expenses is covered by a loan from his parents to be paid out of an anticipated retroactive award of the SSI benefits the SSA has been deducting under the one third reduction rule, the ultimate result would not be altered. Zimmerman's benefits are reduced by $94.77 each month. This amount, when added onto the $300.00 Zimmerman pays to his parents, still does

not equal Zimmerman's $462.67 *pro rata* share of monthly household expenses.

▬ The ALJ's decision, which became the final determination of the Secretary on August 16, 1983 when the SSA Appeals Council declined to grant Zimmerman's request for review, is completely supported by both the evidence on the record and mathematical logic. Moreover, as Magistrate Jordan pointed out in his report and recommendation concerning Zimmerman's action, if the Court were to find, as Zimmerman appears to argue, that Zimmerman should be considered to be living in his own household, not that of his parents, this contention would hurt him far more than it would help. Report and Recommendation to Judge Wexler in *Zimmerman v. Secretary,* No. CV 85–2665, slip op. (E.D.N.Y. April 22, 1987). Zimmerman's benefits are currently being reduced by one third. If he were to be found not to be living in another's household, the one third reduction rule would no longer apply and any income Zimmerman receives would have to be counted in full in calculations of his eligibility for SSI benefits. The record demonstrates that plaintiff receives substantially more in countable income than the $94.77 by which his benefits have been reduced. For instance, Zimmerman's parents supply him with about $80.00 a month for incidental expenses and about $25.00 per month for clothing, and lend him $93.00 each month so that he can cover the $300.00 he is supposed to pay them. The food he receives each month, furthermore, is worth about $167.00. Additionally, there is to be considered the reasonable market value of the shelter his parents provide him.

The Court therefore holds that the Secretary's motion for judgment on the pleadings in the *Zimmerman* case must be granted and Zimmerman's parallel motion denied.[54]

---

A Crisis That Changed His Musical Life" is contained in the administrative record.

**52.** *See* the Court's discussion of the *Karnett* case, *supra* § V(D).

**53.** This holding is consistent with Magistrate Jordan's recommendation. *See* Report and Rec-

ommendation to Judge Wexler in *Shaw,* No. CV 85–2664, slip op. (E.D.N.Y. April 14, 1987.

**54.** This holding is consistent with Magistrate Jordan's recommendation. *See* Report and Recommendation to Judge Wexler in *Zimmerman*

### O. *Chaiten, No. CV 85–2666*

According to ALJ Arthur S. Adler's analysis of the circumstances surrounding Sue Chaiten's claim for increased SSI benefits in his decision dated January 31, 1984, the relevant facts of Chaiten's case are as follows: Chaiten, who is learning disabled, resides with her parents in their home in Plainview, New York. She works five hours a day five days a week at the Contemporary Guidance Workshop in New York City, earning between $.05 and $.50 an hour. Her monthly commutation costs to and from her job are $139.00. At the proceeding held in front of the ALJ, Chaiten testified that she pays her parents $169.00 a month for rent and purchases and prepares her own food. Ethel Chaiten, Chaiten's mother, testified that she does not contribute to her daughter's support but lends her between $270.00 and $275.00 a month. On an SSA form she filled out in March 1982, Ethel Chaiten stated that the current market rental value of the space in the Chaiten home that her daughter uses is approximately $175.00 a month.

Based on his evaluation of the evidence, ALJ Adler ruled that Chaiten is living in her parents' household and receiving in-kind income in the form of shelter. The ALJ was of the opinion that the Chaiten's purported loan arrangement concerning rental and other expenses was a "machination," *i.e.*, Chaiten gives her mother her full SSI check and her parents in turn provide her with in-kind support and maintenance and cash in the amount Chaiten requires to meet her needs. As foundations for his conclusion, the ALJ noted that Chaiten made no mention of the loan arrangement until the SSA undertook to reconsider her eligibility for benefits in March 1982, that Ethel Chaiten's testimony concerning the amount of the loan that had been repaid was somewhat inconsistent, that there is no written record of Chaiten's acknowledgement of an obligation to repay her parents, that Chaiten's mother did not keep complete records of the amount she loaned her daughter, that there was no timetable for repayment of the loan, and that there was no indication that Ethel Chaiten would receive any interest on the loan.

ALJ Adler found that Chaiten does purchase and prepare her meals separately from her parents and that therefore the presumed value rather than one third reduction rule applies. Chaiten, nonetheless, had not demonstrated that the actual value of the in-kind support and maintenance is less than its presumed maximum value. Her SSI benefits must thus be reduced by their presumed one third value plus the general income exclusion. The ALJ further found that Chaiten receives cash gifts from her mother to pay for transportation costs, attorneys fees, and social programs. However, although gifts constitute countable unearned income and the value of the gifts Ethel Chaiten gives her daughter should have been used as a basis for reducing Chaiten's SSI benefits, the ALJ held that the issue of overpayment was not before him and he would not consider the receipt of gifts as a factor in his decision.

■ The ALJ's decision became the final determination of the Secretary when the SSA Appeals Council denied Chaiten's request for review on June 11, 1984. The Court finds, however, that the Secretary's decision is not completely supportable and cannot stand. The ALJ's rulings that Chaiten separately purchases and prepares her own food and that the presumed value rule applies to her claim are grounded on substantial evidence contained in the record. The ALJ, furthermore, correctly concluded that the issue of cash gifts and possible overpayment was not properly before him upon Chaiten's request for his *de novo* decision regarding her entitlement to SSI benefits after lower administration officials had denied her the level of benefits she feels she deserves.

■ The ALJ's rejection of Chaiten's assertion that she and her parents maintain a loan arrangement with regard to her shelter and other expenses, on the other hand, is premised, at least in part, upon a misapplication of the relevant statutory

*v. Secretary,* No. CV 85–2665, slip op. (E.D.N.Y. April 22, 1987).

and administrative provisions. The fact that Chaiten never mentioned the purported loan agreement prior to the SSA's reconsideration of her eligibility in March 1983 does provide justification for the ALJ's ruling, and the question of a witness's credibility (in this instance, that of Ethel Chaiten) is committed primarily to the judgment of the ALJ who has the opportunity actually to view the testimony. *See Howard v. Heckler*, 782 F.2d 1484 (9th Cir.1986); *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383 (6th Cir.1978); *Barrett v. Secretary of the Department of Health, Education and Welfare of the United States*, 581 F.Supp. 484 (S.D.N.Y. 1984). However, a lender/borrower transaction need not be committed to writing to be valid for SSI purposes, and the lack of any written acknowledgement by Chaiten of an obligation to repay her parents and Ethel Chaiten's failure to keep records of the amount her daughter borrowed from her cannot justify a holding that the Chaitens never entered into a loan arrangement recognizable for purposes of SSI benefit calculations. Furthermore, although POMS Manual 01110.030(E) (June 1985) requires that there exist a timetable and plan for repayment of a loan, *see supra* note 3, the Secretary's procedures in no way require that a specific date or schedule be expressly established. Rather, it is sufficient if the borrower plans to repay the loan when he receives future anticipated income. Sue Chaiten's apparent payment of money to her parents upon receipt of a retroactive SSI check in January 1983, purportedly in partial satisfaction of a loan, is sufficient, assuming *arguendo* that the asserted loan is in fact a reality, to indicate a timetable and repayment plan that conforms to the Secretary's requirements. Additionally, SSR 78–26, POMS Manual 01110.030(E) and Regional Circular SSI–79–13 each make explicit that the payment of interest is irrelevant to the determination of whether a transaction constitutes a loan

under the SSI program. *See supra* p. 158 and note 3.

The Secretary's final determination regarding the level of Chaiten's entitlement to SSI benefits is therefore to some extent based upon incorrect legal standards. The ALJ did not specify the weight he placed upon the various factors he noted in reaching his conclusion that the Chaitens' purported loan arrangement is illusory. Nor is the record fully developed as to the existence of the loan. For instance, although Sue Chaiten testified at the hearing before the ALJ, she was not asked a single direct question about the purported loan.

Accordingly, the Court will remand Chaiten's case to the Secretary for further proceedings concerning the issue of whether Sue Chaiten and her parents entered into a loan agreement that might modify the Secretary's previous determination that Chaiten is living in her parents' household and receiving in-kind support in the form of shelter. These proceedings shall include, but need not necessarily be limited to, the taking of additional testimony from Sue Chaiten on this issue, and the Secretary's decision shall be based upon the legal guidelines set forth throughout the Court's opinion.[55]

### P. *Harris, No. CV 85–3379*

Beulah and Bertie Harris have run across a procedural snag that precludes the Court from even considering the merits of their case at this time. In response to an order to show cause Magistrate Jordan issued on March 19, 1987, Charles Robert has filed with the Court copies of certified mail receipts tending to indicate that a summons and complaint in the Harris' action was served upon the Secretary and the office of the Attorney General of the United States in Washington, D.C. Such service, however, is insufficient to satisfy the relevant requirements for service of process that the Federal Rules of Civil Procedure set forth. Fed.R.Civ.P. 4 states, in pertinent part:

---

55. This holding is essentially consistent with Magistrate Jordan's recommendation although the Court's reasons for declining to accept the ALJ's ruling on the issue of the Chaitens' purported loan arrangement differ to a degree from

those the Magistrate put forth. *See* Report and Recommendation to Judge Wexler in *Chaiten v. Secretary*, No. CV 85–2666, slip op. (E.D.N.Y. July 28, 1987).

(d) *Summons and Complaint: Person to be Served.* The summons and complaint shall be served together. The plaintiff shall furnish the person making service with such copies as are necessary. Service shall be made as follows:

. . . .

(4) Upon the United States, by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought or to an assistant United States attorney or clerical employee designated by the United States attorney in a writing filed with the clerk of the court and by sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, District of Columbia, and in any action attacking the validity of an order of an officer or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered or certified mail to such officer or agency.

(5) Upon an officer or agency of the United States, by serving the United States and by sending a copy of the summons and of the complaint by registered or certified mail to such officer or agency. . . .

. . . .

The service effectuated in the *Harris* action does not conform to the procedures Rule 4 establishes. Generally, such a situation would necessitate that the Court dismiss plaintiffs' lawsuit. However, courts have often been more lenient and permitted defects in service upon the federal government and its officers and agencies to be cured where outright dismissal of the action would bar a litigant's claim because of the running of the statute of limitations. *E.g., Jordan v. United States*, 694 F.2d 833 (D.C.Cir.1982); *Williams v. General Services Administration*, 582 F.Supp. 442 (E.D.Pa.1984). 42 U.S.C. § 405(g) allows a

civil action seeking review of a final decision by the Secretary to be filed in a federal district court for a sixty day period after the mailing of notice of such an administrative decision. This time, of course, has long since passed in the Harris' case. The Court will therefore allow plaintiffs to cure the defective service by causing proper service to be made within fifteen days of the entry of this Memorandum and Order. Failure to rectify the improper service within this time will result in dismissal of the case. The Secretary shall serve and file his answer and a certified copy of the administrative record within the time allotted by law. Magistrate Jordan shall then formulate an expedited schedule for the filing of motions for judgment on the pleadings and prepare a report and recommendation setting forth a suggested disposition of the *Harris* case within thirty days after the last date for any papers to be filed under the new briefing schedule.[56]

### Q. *Kilmnick, No. CV 86–0603*

The administrative record pertaining to Jeffrey Kilmnick's claim betrays a certain confusion on the part of the SSA and a somewhat inadequate development of the record by both the ALJ and Kilmnick's attorney Charles Robert. The SSA has determined that from April 1981 to June 1982 Kilmnick was living in his father's household in East Meadow, New York and receiving in-kind support and maintenance. His SSI benefits for that period were therefore reduced under the one third reduction rule. The SSA has also determined that, starting in July 1982, Kilmnick has resided in his own household and has not been receiving in-kind support and maintenance.

Kilmnick's living situation does not appear to have changed in any material respect that would justify the SSA's disparate determinations. Rather, the initial SSA decision appears from the record to have been based upon Kilmnick's statements that he was paying $175.00 a month for various expenses, including rent and food, while the second SSA ruling seems to be

---

**56.** Magistrate Jordan recommended that *Harris* be dismissed for lack of prosecution. Report and Recommendation to Judge Wexler in *Harris*

*v. Secretary*, No. CV 85–3379, slip op. (E.D.N.Y. April 9, 1987).

grounded primarily on his subsequent statement in July 1982 that he now paid $169.00 rent for his room in his father's premises and $50.00 for food each month.

In a decision dated November 16, 1983, ALJ Edward V. Alfieri refused to grant Kilmnick's request that he be retroactively reclassified as having lived in his own household from April 1981 to June 1982 so that the SSA's earlier classification of Kilmnick's situation might be brought into conformance with its later determination. The ALJ's ruling became the final decision of the Secretary when, on February 9, 1984, the SSA Appeals Council declined to review Kilmnick's claim.

This Court does not see how the SSA's two decisions can reasonably be harmonized as they now stand. However, the Court is of the opinion that a judicial attempt to find and interpret the facts relevant to Kilmnick's claim is not warranted given the incomplete record now before the Court. There appears to be little probative evidence, for example, concerning the fair market rental value of the premises in which Kilmnick resides. There is a similar lack of evidence regarding the nature of any in-kind support and maintenance that Kilmnick may receive from his father. Kilmnick's father did not testify at the hearing before the ALJ and Kilmnick's total testimony consisted of the one word answer "no" to Robert's question as to whether any SSA employee had ever informed plaintiff of the definitions of a "household" and a "tenant". The Court does not consider it appropriate under the circumstances presented by Kilmnick's claim that it determine without further guidance from the Secretary the ultimate validity of the SSA's reduction of benefits from April 1981 to June 1982 that Kilmnick now challenges. Therefore, the Court will remand Kilmnick's case to the Secretary for further development of the record and analysis of the merits of Kilmnick's claim. Upon remand, the administrative proceedings and investigation of Kilmnick's case should include, but not be limited to, the taking of testimony from both Kilmnick and his father.[57]

### R. Lo Brutto, No. CV 86–0604

In a decision dated November 16, 1983, ALJ Edward V. Alfieri found that Peter Lo Brutto resides with his mother in a subsidized rental unit in Manhattan, contributes his proportionate share to the meeting of household expenses, and is not receiving in-kind support and maintenance. Accordingly, the ALJ held that Lo Brutto is living in his own household for purposes of eligibility for SSI. The ALJ further found it uncontroverted that Lo Brutto's meals are purchased, prepared, and consumed in common with his mother and that he thus must be considered to be living with others for purposes of New York supplementary assistance payments. The ALJ's decision became the final determination of the Secretary when, on February 13, 1984, the SSA Appeals Council declined to grant Lo Brutto's request for review.

The ALJ's decision is supported by substantial evidence on the record in all respects. The ALJ's finding that Lo Brutto is living in his own household for purposes of the payment of federal SSI benefits is presumably the conclusion plaintiff desires and is solidly grounded upon the evidence contained in the administrative record. The commonality of food purchase, preparation, and consumption by plaintiff and his mother is factually unchallenged and the legal conclusion that this joint arrangement concerning food indicates the existence of a multi-person household for state supplementary assistance purposes even if it is insufficient to support a holding that one is living in another's household under the federal standard simply reflects New York State's legitimate establishment of its own varying benefit payment levels based upon its own criteria concerning differing living arrangements. See supra § III(C).

The Court will therefore grant the Secretary's motion for judgment on the plead-

**57.** Magistrate Jordan recommended that the Court grant the Secretary's motion for judgment on the pleadings and deny Kilmnick's motion. Report and Recommendation to Judge Wexler in *Kilmnick v. Secretary*, No. CV 86–0603, slip op. (E.D.N.Y. June 17, 1987).

ings in *Lo Brutto* and deny Lo Brutto's equivalent motion.[58]

### S. *Jacqueline Ferguson, No. CV 86–0605*

Jacqueline Ferguson, like her brother Thomas Ferguson, *see supra* § V(G), lives with her father in a condominium in Medford, New York. In a decision dated October 31, 1984, ALJ Milton Pravitz found, based on the testimony of Ferguson's father, that Ferguson pays her father $100.00 a month for rent and food, an amount that does not constitute a proportionate share of the household expenses. The ALJ noted that in April 1983 Ferguson and her father entered into an agreement under which Ferguson agreed to pay her father $169.00 for rent and $100.00 for food each month,[59] but found that this agreement has never been enforced. ALJ Pravitz also rejected Ferguson's argument that she is borrowing from her father the difference between what she agreed to pay her father and the amount she actually pays, ruling that a necessary element of a loan for SSI purposes is that money actually change hands. The ALJ additionally declined to accept Ferguson's position that certain Christmas and birthday gifts she received from her grandmother and boyfriend were loans to be repaid. The ALJ therefore ruled that the gifts must be considered countable unearned income, that Ferguson was not "without fault" in failing to report her acceptance of the gifts to the SSA so that the agency could ascertain any effect the gifts might have on her SSI eligibility, and that the Secretary's recoupment of overpayment thus could not be waived. The ALJ's decision became the final determination of the Secretary when the SSA Appeals Council denied Ferguson's request for review on February 8, 1984.

The ALJ's decision is supported by the required substantial evidence on the record. It is apparent that Ferguson does not pay her *pro rata* share of household expenses. Although the ALJ's rationale for finding that the purported loan between the elder Ferguson and his daughter regarding her incomplete payments under their April 1983 agreement is not acceptable, *see supra* § III(E), it is apparent from the record that the agreement is nothing more than a paper arrangement that has never been, and was probably never intended to be, enforced, and that any supposed accrued "debt" under the agreement is illusory. Finally, there can be little doubt that failure to apprise the SSA of the receipt of cash gifts, which unarguably constitute income under the Social Security Act, 42 U.S.C. § 1382a(a)(2), constitutes "fault" precluding waiver of adjustment or recovery of any overpayment resulting from the omission to report such income.

Accordingly, the Court will grant the Secretary's motion for judgment on the pleadings in Jacqueline Ferguson's action and deny Ferguson's motion for judgment on the pleadings.[60]

---

**58.** Magistrate Jordan's report and recommendation in *Lo Brutto* indicates that the Magistrate was under the impression that the Secretary had found Lo Brutto to be living in the household of another and receiving support and maintenance and that the resolution of the case should turn on whether the support and maintenance Lo Brutto received constitutes a loan or a gift. Magistrate Jordan was of the opinion that Lo Brutto lacks the mental capacity to enter into a legally enforceable loan agreement and that therefore the Secretary's motion for judgment on the pleadings should be granted and plaintiff's motion denied. *See* Report and Recommendation to Judge Wexler in *Lo Brutto*, No. CV 86–0604, slip op. (E.D.N.Y. May 27, 1987).

**59.** This agreement is essentially identical to that into which Thomas Ferguson and his father entered. *See supra* p. 181.

**60.** In his report and recommendation, Magistrate Jordan expressed his view that substantial evidence supports the ALJ's decision as to the period before the April 1983 agreement and determination that overpayment may not be waived, but does not support the ALJ's decision insofar as it pertains to the period after Ferguson and her father entered into their written agreement. The Magistrate therefore recommended that the Court vacate the Secretary's final determination and remand the case to the Secretary for computation of benefits to be paid starting May 1, 1983. Report and Recommendation to Judge Wexler in *Jacqueline Ferguson*, No. CV 86–0605, slip op. (E.D.N.Y. June 19, 1987).

### T. *Aaron Green, No. CV 86–2084*

The administrative record in Aaron Green's case indicates that Green was awarded SSI benefits effective April 1, 1984 based upon a March 12, 1984 application. The SSA subsequently determined that, effective December 1, 1984, Green should be considered to be living in his own household for purposes of federal SSI benefits but that since he does not separately purchase and prepare his own food, but rather makes contributions towards the food costs of meals prepared in common with his parents with whom he resides, his state supplementary assistance benefit level must be that available to persons living with others. In a decision dated May 31, 1985, which became the final determination of the Secretary when the SSA Appeals Council ultimately denied Green's request for review on October 15, 1986, ALJ Milton Pravitz ruled that, given Green's resources and living arrangements, Green is in receipt of the correct amount of federal SSI and state supplementary assistance benefits and that New York State has the authority to establish its own categories with respect to living arrangements that affect state supplementary assistance payments.

The ALJ's decision is supported by the factual evidence the record presents concerning Green's financial and living arrangements, and, as the Court has held above, *supra* § III(C), New York has acted in complete conformance with the Social Security Act and the Secretary's regulations in establishing classifications of living arrangements for the purpose of setting the proper level of supplementary assistance benefits individuals may receive that differ to some extent from the classifications the SSA employs in calculating federal SSI benefit levels.

Accordingly, the Court grants the Secretary's motion for judgment on the pleadings in Aaron Green's action and denies Green's corresponding motion.[61]

## VI. CONCLUSION

For the reasons set forth throughout this opinion, the Court hereby holds that:

1. The circumstances surrounding the *Ruppert* cases do not warrant any broad-based ruling by the Court grounded upon any purportedly wrongful "clandestine policy" on the part of the Secretary and SSA employees.

2. The Secretary's procedures for interpreting the Social Security Act do not violate the Administrative Procedure Act.

3. The Court's decision in *Fanning v. Heckler* does not in any way control the Court's resolution of the instant litigation.

4. New York State's method of categorizing the living arrangements of SSI recipients and the Secretary's application of these classifications in his administration of the state's supplementary assistance program are valid.

5. Federal regulations and rules, not state law, define the conditions under which a transaction will be deemed a loan for SSI purposes.

6. The definition of a loan for SSI purposes cannot be restricted solely to cash transactions but also covers arrangements involving the borrowing of in-kind support and maintenance, provided that the circum-

**61.** The Court also rejects as completely unfounded plaintiff's assertion that the Secretary has somehow violated Fed.R.Civ.P. 11 in filing his pleadings in the *Aaron Green* case.

In the report and recommendation he prepared for Aaron Green's case, Magistrate Jordan stated his belief that the issue presented by the case was whether certain monies paid by plaintiff's mother to plaintiff's father on plaintiff's behalf constitute in-kind income rather than the proceeds of the loan. The Magistrate concluded that Green lacks the mental capacity to enter into a legally binding loan arrangement and therefore recommended that the Court grant the Secretary's motion for judgment on the pleadings and deny plaintiff's similar motion. *See* Report and Recommendation to Judge Wexler in *Aaron Green*, No. CV 86–2084, slip op. (E.D. N.Y. April 14, 1987). It may be, as the Secretary has suggested in his papers, that the Magistrate's focusing of his report and recommendation on an issue not relevant to Aaron Green's action can be explained by a confusion between *Aaron* Green's lawsuit and the claim filed by *Alan* Green, although the central issue in Alan Green's case was not that of the existence of a loan but the fair market rental value of the room Alan Green rented from his mother. *See* *supra* § V(C).

stances presented by a given SSI recipient's situation demonstrate the existence of the other necessary elements of a valid loan.

7. The Second Circuit's decision in *Rothman v. Schweiker* precludes the Court from applying the Seventh Circuit's holding in *Jackson v. Schweiker* to the *Ruppert* cases.

8. SSA Interim Circular No. 185 (June 3, 1985) and OHA Staff Guides and Programs Digest Bulletin No. III–I (August 22, 1986) are not relevant to the litigation at bar.

9. Guardians *ad litem* need not be appointed for any of the plaintiffs in the *Ruppert* cases. The guardian *ad litem* Magistrate Jordan appointed in several of the individual actions is discharged of her duties but may petition the Court for a reasonable fee for her services within twenty days of the entry of this decision if she deems such a fee application appropriate. Counsel for plaintiffs is directed to supply the appointed guardian *ad litem* with a copy of the decision immediately upon its receipt.

10. Plaintiff Aaron Green's motion for joinder of the State Commissioner as an involuntary plaintiff in his individual action pursuant to Fed.R.Civ.P. 19(a) is denied.

11. The State Commissioner's request that the Court award him attorneys fees for having to respond to Aaron Green's motion under Rule 19(a) is denied.

12. The State Commissioner's motion for judgment on the pleadings in the *Hill* case is granted and Jocelyn Hill's complaint against him is dismissed.

13. Hill's request for an order requiring the defendants named in her individual action to submit certified copies of the transcripts of certain federal and state administrative hearings held in connection with her applications for benefits is denied.

14. Mary Ruppert's individual action is remanded to the Secretary for the purposes of calculating the SSI benefits to which Ruppert is entitled for the period January through September 1980 and determining Ruppert's entitlement to SSI benefits starting October 1, 1980. Upon remand, the Court's ruling that substantial evidence supports the Secretary's determination that Ruppert is living in her parents' household and that her parents provide plaintiff with in-kind support and maintenance in the form of food and shelter shall be binding upon the parties.

15. The Secretary's motion for judgment on the pleadings in Angela Mauro's individual action is granted and Mauro's corresponding motion is denied.

16. The Secretary's motion for judgment on the pleadings in Alan Green's individual action is granted and Green's motion is denied.

17. The Secretary's motion for judgment on the pleadings in Cheryl Karnett's individual action is granted and Karnett's similar motion is denied.

18. The Secretary and Suffolk Commissioner's respective motions for judgment on the pleadings in Jocelyn Hill's individual action are each granted and Hill's parallel motion is denied.

19. Anthony DeFeo's individual action is referred back to Magistrate Jordan for the purposes of establishment of a revised briefing schedule and preparation, by no later than December 31, 1987, of a new report and recommendation.

20. The Secretary's motion for judgment on the pleadings in Thomas Ferguson's individual action is granted and Ferguson's equivalent motion is denied.

21. Edward and Rose Faicco's complaint in their individual action must be dismissed as against the State Commissioner for lack of service. The Secretary's motion for judgment on the pleadings in the Faiccos' action is granted and the Faiccos' motion for judgment on the pleadings is denied.

22. Margaret Mormoris's motion for judgment on the pleadings in her individual action is granted and the Secretary's corresponding motion is denied. The case is remanded to the Secretary for expeditious calculation and awarding of the amount of benefits that Mormoris was wrongfully denied.

23. Olga White's individual action is referred back to Magistrate Jordan so that the Magistrate can establish a revised briefing schedule and prepare a new report and recommendation to be submitted by no later than December 31, 1987.

24. Lawrence Podell's motion for judgment on the pleadings in his individual action is granted and the Secretary's motion is denied. The case is remanded to the Secretary for expeditious calculation and awarding of the amount of benefits that Podell was wrongfully denied.

25. Matthew Stone's individual action is remanded to the Secretary with directions that he consider whether Stone's SSI benefits should be reduced notwithstanding the Court's holding that the definition of a loan for SSI purposes covers arrangements involving the borrowing of in-kind support and maintenance or whether Stone is indeed entitled to the increased benefits he desires.

26. The Secretary's motion for judgment on the pleadings in Victoria Shaw's individual action is granted and Shaw's similar motion is denied.

27. The Secretary's motion for judgment on the pleadings in Steven Zimmerman's individual action is granted and Zimmerman's parallel motion is denied.

28. Sue Chaiten's individual action is remanded to the Secretary for further proceedings concerning the issue of whether plaintiff and her parents entered into a loan agreement that might modify the Secretary's previous determination that Chaiten is living in her parents' household and receiving in-kind support and maintenance in the form of shelter. The proceedings upon remand shall include, but need not necessarily be limited to, the taking of additional testimony from Chaiten on this issue. The Secretary's decision shall be based upon the legal guidelines set forth throughout the Court's opinion.

29. Beulah and Bertie Harris shall cure the defective service in their individual action within fifteen days of the entry of this decision. Failure to do so shall result in dismissal of the case. The Secretary shall serve and file his answer and a certified copy of the administrative record within the time allotted by law. Magistrate Jordan shall then formulate an expedited schedule for the filing of motions for judgment on the pleadings and prepare a report and recommendation setting forth a suggested disposition of the action within thirty days after the last date for any papers to be filed under the new briefing schedule.

30. Jeffrey Kilmnick's individual action is remanded to the Secretary for further development of the record and analysis of the merits of Kilmnick's claim. Upon remand, the administrtive proceedings and investigation of Kilmnick's case should include, but not be limited to, the taking of testimony from both Kilmnick and his father.

31. The Secretary's motion for judgment on the pleadings in Peter Lo Brutto's individual action is granted and Lo Brutto's equivalent motion is denied.

32. The Secretary's motion for judgment on the pleadings in Jacqueline Ferguson's individual action is granted and Ferguson's motion for judgment on the pleadings is denied.

33. The Secretary's motion for judgment on the pleadings in Aaron Green's individual action is granted and Green's corresponding motion is denied.

34. Aaron Green's assertion that the Secretary violated Fed.R.Civ.P. 11 in filing his pleadings in Green's individual action is completely unfounded.

35. Each party is to bear his own costs.

36. Counsel for plaintiffs is not to assert that any new case filed with the Court is related to the *Ruppert* cases as a whole or to any of the individual actions that comprise this litigation without first supplying the Court with a brief statement of the nature of the purported relationship and obtaining the Court's permission to file the new action as a related case.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.